1
2
3
4
5                    UNITED STATES DISTRICT COURT
6
7                   NORTHERN DISTRICT OF CALIFORNIA
8
9    BRIAN F. ROGERS,
10              Plaintiff,                      No. C 23-02756 WHA
11         v.
12   LOW INCOME INVESTMENT FUND,               **ORDER DECLARING BRIAN F.**
     AARON BASKIN, PAUL                        **ROGERS A VEXATIOUS LITIGANT**
13   WETTERHOLM, ADINA ZBRINGER,               **AND IMPOSING A PREFILING**
     JOHANNA VAQUEZ, and SABRINA               **ORDER**
14   BAPTISTE,
15              Defendants.
16   _____
17                          **INTRODUCTION**
18        A prior order granted summary judgment in favor of defendants on all claims and
19   imposed a monetary sanction and lien so that defendants could recover the costs imposed by
20   plaintiff's case-specific, bad-faith conduct. That order retained jurisdiction to enforce the
21   sanction and to consider whether to declare plaintiff a vexatious litigant. For the reasons
22   below, this order declares plaintiff a vexatious litigant and imposes a prefiling order.
23                          **STATEMENT**
24        Before the undersigned district judge, plaintiff Brian F. Rogers brought discrimination
25   claims he knew to be meritless while using the fact of our court proceedings and the threat of
26   public accusations to attempt to extort insurance-policy payouts from an organization devoted
27   to developing low-income communities and defeating racism (*see* Dkt. No. 90 at 5–14, 21–25).
28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

The case concerned Rogers's application for a job. Rogers applied using a resume that falsely stated he was still working in a position from which he had been let go over two years prior, and that falsely represented he worked on complex tasks in a senior role at an internet company from which he in fact had received little to no compensation for little to no work for over a decade, as this was in fact his way of characterizing — including by way of a website featuring fake lines of business and fake office locations — his purported self-employment (*see* Dkt. No. 90 at 3, 19; *infra* Statement § 3.C.vi). After the screening interview revealed no red flags, the substantive interview revealed that Rogers could not speak in stride about his purported skills and experiences. He was not hired (*see* Dkt. No. 90 at 3–4, 19).

Less than two hours after receiving what Rogers deemed a "boilerplate" rejection, Rogers responded with what proved to be boilerplate of his own: He threatened litigation "in U.S. Federal District Court for discrimination" (*see id.* at 7 (excerpting Dkt. No. 74-2 at 16–17)). Rogers, who is black, did not bother to check whether the person he then berated repeatedly as a "white racist" was also black (*see id.* at 7–8 & n.3). Rogers later admitted that nothing particular about the application process made him suspect racism except that he was not hired — which remained his chief evidence of disparate treatment at close of discovery two years later (*see, e.g.*, *id.* at 18–19).

What Rogers did know from the outset were facts about the organizational defendant. The Low Income Investment Fund is a community-development finance organization that deploys capital into low-income communities to improve educational attainment, public health, and economic opportunity — and it is devoted to defeating racism (*see* Dkt. No. 1 ¶ 25; Dkt. No. 90). Rogers believed that LIIF would be sensitive to public accusations of racism. Indeed, he wrote in his email to his LIIF contact two hours after his job application was rejected that

> I think YOUR donors should know about your white racist conduct
> as well. Let's see whether you still have an organization (or a job)
> after revealing this to YOUR donors.

(Dkt. No. 90 at 7–8 (excerpting Dkt. No. 74-2 at 19); *see also id.* at 10–11 (excerpting Dkt. No. 72-1 at 21)). Rogers also knew then or soon learned that LIIF had an insurance policy to pay out claims of employment discrimination (*see id.* at 22 (discussing Dkt. Nos. 60, 69, 72-1)).

1    Rogers filed his complaint.  Its accusations far surpassed any foundation for his claims,

2    as Rogers later admitted, and all claims ultimately proved meritless (*see infra* Analysis

3    § 3.A.ii.b (excerpting amended complaint at length); *see* Dkt. No. 90 at 9–10, 15).  Rogers's

4    amended complaint comprised claims of discrimination by race, sex, and national origin, and

5    intentional infliction of emotional distress (*see* Dkt. No. 90 at 9–10, 23).

6    After filing and amending his claims, Rogers failed to pursue any of them diligently.  He

7    failed to propound depositions (*id.* at 12 (citing Dkt. Nos. 64, 66)) and failed to read responses

8    to what discovery requests he did make (*id.* at 11 (citing Dkt. Nos. 59)), before moving to

9    extend discovery without good cause (*id.* at 12 (citing Dkt. No. 66)).  Meanwhile, he evaded

10   defendants' efforts to depose him and to disprove his claims in court (*id.* at 11–12).

11   Instead of getting to the bottom of his claims, Rogers sought to prolong the proceedings

12   while using them as leverage to pursue an insurance payout in bad faith:  When opposing

13   counsel emailed Rogers on July 23, 2024 to ask him about his deposition, Rogers did not

14   respond.  Instead, on July 24, 2024, Rogers emailed a donor of defendant LIIF to cite the

15   ongoing case, to assert that on "numerous occasions" LIIF "ha[d] refused to hire African

16   Americans," and to demand that LIIF's "financial support should be suspended, cancelled, and

17   refunded gifts [*sic*] immediately by you and all of their donors"  (*id.* at 21 (citing record); *see*

18   *also id.* at 10–11 (excerpting donor email)).  Rogers followed up with opposing counsel to be

19   sure counsel knew this was just the start (*ibid.*).  Only when the Court specifically ordered

20   Rogers to sit for his deposition did Rogers finally do so, whereupon he could not provide under

21   oath any basis for statements made in his extortionate emails and complaint (*id.* at 21–22).

22   All claims in the case were decided at summary judgment in favor of defendants and

23   against Rogers (*id.* at 20).  Rogers was sanctioned for case-specific, bad-faith conduct that

24   imposed costs on LIIF, which Rogers was ordered to pay by way of a lien against future

25   settlements and judgments (*id.* at 21–25).

26   The Court retained jurisdiction to inquire into Rogers's conduct beyond this case, and

27   provided Rogers notice and an opportunity to be heard in that regard (*ibid.*; *see also* Dkt. No.

28   94).

United States District Court
Northern District of California

As it turns out, the vexatious conduct by Rogers in the instant case was preceded by an entire career of unmeritorious lawsuits.  When early in this case the Court asked whether Rogers should get a lawyer, it seemed Rogers had some experience.  The judge asked how many cases he had litigated.  Rogers said "probably more than two" (*see* Dkt. No. 61 at 1).  In fact, Rogers already had brought or attempted to bring more than two dozen cases across more than a quarter century (*infra*).

We have assembled for all to see the 25-year history of 27 frivolous cases brought or attempted to be brought by Rogers (*infra*).  In brief:  His earliest known charge before the United States Equal Employment Opportunity Commission dates to 1993, a charge Rogers admitted he filed while not believing he had been discriminated against (*infra* Statement § 3.A.i (*re* Santa Clara Cnty.)).  His earliest federal-court complaint dates to 1999, a complaint Rogers unilaterally asked to dismiss after he refused to appear for the summary judgment hearing, accused opposing counsel from Heller Ehrman White & McAuliffe LLP of incompetence, and accused Judge Martin Jenkins of corruption (*see infra* Statement § 3.A.ii (*re Bank of Am.*)).[1]  His most recently-decided case is the instant one, filed in 2023 (another pends) — wherein, when the chips were down, Rogers again accused opposing counsel of incompetence and the undersigned of worse (*see* Dkt. No. 90 at 13–14; Dkt. No. 95).

In the 25 years between these bookends, Rogers developed a distinct modus operandi:  Take misleading statements so far as they will go in daily life, until getting found out triggers a setback.  Then bring frivolous and harassing claims about the persons and organizations associated with the setback in court, until the claims' lack of merit is revealed in turn (or about to be).  Finally, make frivolous and harassing statements about those associated with this legal result — including opposing counsel, early neutral evaluators, and judges.

The list of jurists whom Rogers has determined to "play games," be "<u>an agent of the defense</u>," be "asleep," be "blind or dumb," have less than a "fourth grade education with 'half-of-a brain,'" be "racist," be "a slave," "have no life," "have no value in life," and "simply

---

[1]  For readability, the case names of Rogers's past matters are abbreviated as set out in the timeline of cases, where other abbreviated citation formats are also explained (*infra* notes 2–3, 6).

United States District Court
Northern District of California

exist" ("You simply exist.") is a list nearly as long as the list of cases brought by Rogers (*see infra*). Some litigants disagree with judicial decisions. Rarely like Rogers. But by Rogers's telling, the extraordinary — facing discrimination applying for one job, applying for another job, applying for the next job, applying for the ninth job, *and* thereafter again facing incompetence and racism from the judges in nearly as many cases — is routine. What common sense would suggest, the record assembled confirms. *Cf. Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1060–62 (9th Cir 2007) (per curiam) (affirming prefiling order imposed for bringing civil rights claims "that are contrived, exaggerated, and defy common sense").

Across 27 matters Rogers has brought or attempted to bring in federal and state court, Rogers has prevailed on the merits exactly once. That exception unfortunately proves the rule: Frustrated that the $280 award (for what Rogers complained was a "smudge" or "chemical residue" left by a repair shop on his car) was far less than the thousands of dollars Rogers believed he deserved — and further frustrated that this $280 award was fully offset by sanctions that Rogers still owed from an earlier iteration of his complaint, which he had failed to prosecute (*infra* Statement § 2.A (re *Tipton I* and *Tipton II*)) — Rogers brought further litigation accusing the state small-claims court judge who granted the $280 award of racism (*id.* § 2.B (re *San Diego I*)). When that case was dismissed with prejudice in turn, Rogers accused the federal district judge who dismissed the latest case of having "half-of-a brain," then "re-filed" the complaint and threatened to do so "<u>CONTINUOUSLY</u>" until he got the result he demanded (*ibid.* (re *San Diego II*)). Further, only one case of Rogers appears to have resulted in a settlement. That jointly stipulated dismissal occurred shortly after the case had been removed to federal court and the district judge had repeated plaintiff's apparent doubts as to the strength of his own claims (*infra id.* § 3.A.iii (re *Previo*)).

Over a decade ago, a state-court judge in San Diego declared Rogers vexatious, before ultimately vacating that order once Rogers redirected his filings to the federal courts and farther north (*infra id.* §§ 2.C–D (re *Tipton III*)). And, over five years ago, a federal judge in our district considered whether to declare Rogers vexatious, but decided not to do so in a

1    "close case" — warning Rogers that such a declaration could become necessary should his

2    conduct continue (*infra id.* § 3.B (re *Bank of S.F.*)).  Rogers's conduct has gone on unabated.

3        This is no longer a close case.

4        Rogers is a vexatious litigant, as the below background and analysis shows.  What makes

5    his litigation especially vexatious is that it almost always invokes state and federal civil rights

6    laws.  These laws matter.  The frivolousness of Rogers's complaints is an affront to those who

7    sacrificed to achieve these laws and to those who depend upon them to redress real wrongs.

8    Rogers's allegations detract from the ability of defendant organizations and district courts to

9    respond to legitimate civil rights complaints with the time and resources they deserve.

10   Rogers's complaints have not vindicated civil rights abuses, but have abused the civil rights

11   laws for improper purposes and petty gain.  *Cf. Molski v. Mandarin Touch Rest.*, 347 F. Supp.

12   2d 860, 868 (C.D. Cal. 2004) (Judge Edward Rafeedie), *aff'd sub nom. Molski v. Evergreen*

13   *Dynasty Corp.*, 500 F.3d at 1060–62.

14       This order starts by listing chronologically Rogers's known matters (Statement § 1).  It

15   then reviews in more detail the matters most relevant to the decisions of the state judge (*id.*

16   § 2) and the federal judge (*id.* § 3) who previously considered whether Rogers is vexatious.

17   After reviewing our posture (*id.* § 4), this order finally turns to analyze the four prongs of the

18   vexatious litigation test (Analysis §§ 1–4).

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

1.    **THE TIMELINE OF ROGERS'S KNOWN LITIGATION.**

Rogers has filed the following cases in state and federal court (or has attempted to file, where he was subject to and abided an earlier prefiling order).  Citations are to the original dockets[2] and, where marked "SI," to copies earlier reviewed by Judge Susan Illston.[3]  As did Judge Illston, this order takes judicial notice of Rogers's statements and the courts' decisions.  Vex. Order, *Bank of S.F.*, Dkt. No. 29 [2019 WL 6311393, at *1]; *cf. Khoja v. Orexigen Theraps., Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (notice in Rule 12(b)(6) context).

| Docket for *Rogers v.* | Key Allegation: | Conclusion |
|---|---|---|
| **1.** *Bank of Am. Corp.*, No. C99-05146 MJJ (N.D. Cal.) [SI 109]. | Rogers applied for a job in the Bay Area but was not hired because he is black. Dkt. No. 1 (Dec. 2, 1999). | Dismissed with prejudice by stipulation after plaintiff stated he "wish[ed to] remove the case from trial and end this case effective immediately," after accusing court and defendants of "play[ing] games," and after refusing a settlement he said "avoid[ed] any financial liability." Dkt. No. 42 Exh. C (Dec. 7, 2000) (letter rejecting settlement); Dkt. No. 63 (Apr. 5, 2001) (letter explaining desire to end case); Dkt. No. 65 (Apr. 13, 2001) (stip.) (Judge Martin Jenkins). |
| **2.** *Previo, Inc.*, No. GIC-776937 (Cal. Super. Ct. Cnty. San Diego), *removed*, No. 01 CV 02200 J NLS (S.D. Cal.) [SI 2]. | Rogers applied for a job in San Diego but was not hired because he is black. ROA No. 1 [SI 1] (Oct. 25), *removed*, Dkt. No. 1 [SI 1] (Nov. 29, 2001). | Dismissed with prejudice upon stipulation of parties after the district court said it was "unclear whether Plaintiff wishes to 'voluntarily dismiss' his federal claim because it lacks merit or because the Plaintiff wishes to seek redress in state court." Dkt. No. 9 (Jan. 23, 2002) (order re remand) (Judge Napoleon Jones); Dkt. No. 13 [SI 5] (Feb. 11, 2002). |

---

[2]  Specific documents filed in cases are cited in the timeline by docket number and date.  Beyond this timeline, documents are cited more fulsomely as <Document Title at Page Number, *Short Case Name*, Document's Docket Number, Document's Exhibit Number [SI ___]>, without repeating the case number and without providing other information unless salient.  Nearby citations to the same document omit everything but <Document Title at Page Number> or <*Id.* at Page Number>.  The purpose is to improve readability while supporting reviewability.  To that end, the "[SI ___]" designation is appended where relevant, as set out in the next footnote.

[3]  "[SI __]" refers to the exhibit number within the nearly 1,000-page record collected before Judge Illston, i.e., the exhibit within the Request for Judicial Notice, *Bank of S.F.*, Dkt. No. 21.

| | | |
|---|---|---|
| **2.** *Zions Bancorp.*, No. 2:08-cv-01531-RLH-GWF (D. Nev.) [SI 6]. | Rogers sought to deposit funds into a Nevada bank but — because he is black — it said it would hold them for 10 days before depositing. Dkt. No. 5 [SI 7] (Nov. 6, 2008). | Adjudged summarily in favor of bank because "[c]omplaint has been shown to misstate the facts and a cursory reading demonstrates that Plaintiff's claims for race discrimination are mere conclusory allegations." Dkt. No. 14 [SI 8] (May 7, 2009) (Judge Roger Hunt). |
| **3.** *Apartment Mgmt. Consultants, LLC* ("*AMC I*"), No. 11 CV 0438 MMA WVG (S.D. Cal.) [SI 10]. | Rogers did not get back a $150 deposit from his landlord for a Nevada-based apartment, after landlord also did not give proof of tenancy without $25 fee or solve bug and chemical issues. Dkt. No. 1 [SI 11] (Mar. 3, 2011). | Dismissed without prejudice for failure to prosecute after application for *in forma pauperis* status was denied. Dkt. No. 3 [SI 13] (Mar. 28, 2011) (Judge Michael Anello). |
| **4.** *Tipton Enters. Inc.* ("*Tipton I*"), No. 37-2011-00066377-CL-PA-EC (Cal. Super. Ct. Cnty. San Diego) [SI 29]. | Rogers took his car to a car shop and its staff left a "smudge"-like "chemical residue" on trunk. ROA No. 1 [SI 30] (Mar. 9, 2011). | Dismissed with prejudice for failure to prosecute in violation of orders compelling discovery; awarded sanctions and costs totaling $925. ROA No. 36 [SI 31] (Jan. 26); ROA No. 41 [SI 32] (Feb. 22, 2012) (Judge Eddie Strugeon). |
| **5.** *Apartment Mgmt. Consultants, LLC* ("*AMC II*"), No. 11 CV1140LAB BGS (S.D. Cal.) [SI 14]. | *See AMC I.* Dkt. No. 1 [SI 15] (May 25, 2011), *amended*, Dkt. No. 3 [SI 17] (Aug. 24, 2011). | Dismissed without prejudice upon failure to amend, after first dismissing with leave to amend for improper venue and other defects; application to proceed *in forma pauperis* denied for failure to value Centium, Inc., a business Rogers claimed to own. Dkt. Nos. 4 & 6 [SI 18 & 19] (Sept. 20 & Oct. 17, 2011) (Judge Larry Alan Burns). |
| **6.** *Tipton Enters.* ("*Tipton II*"), No. 37-2011-00021867-SC-SC-EC (Cal. Super. Ct. Cnty. San Diego) [SI 33]. | *See Tipton I.* ROA No. 1 [SI 34] (Nov. 18, 2011). | Adjudged in favor of Rogers after small claims trial, ordering shop to repaint car *or* pay $280 — though the $280 was offset by the $925 costs and sanctions awarded to shop in *Tipton I.* ROA No. 23 [SI 35] (Feb. 15, 2012) (Judge Lantz Lewis). |
| **7.** *Apartment Mgmt. Consultants, LLC* ("*AMC III*"), No. 2:13-cv-01646-APG-VCF (D. Nev.) [SI 20]. | *See AMC I, II.* Dkt. No. 3 [SI 21] (Sept. 17, 2013). | Dismissed with prejudice for lack of jurisdiction after Rogers failed to oppose report recommending same. Dkt. No. 4 [SI 23] (Dec. 17, 2013), *adopt'g* Dkt. No. 2 [SI 22]. |

| **8.** *Tipton Enters., Inc.* ("*Tipton III*"), No. 37-2012-00066620-CL-PO-EC (Cal. Super. Ct. Cnty. San Diego) [SI 38]. | *See Tipton I, II.* "[R]e-filed" seeking even more damages, which had been previously denied. ROA No. 1 [SI 39] (Apr. 6, 2012). | Dismissed with prejudice voluntarily by Rogers after defendants threatened sanctions. ROA No. 22 (July 6); *see also* ROA No. 75 [SI 42] (Oct. 3, 2012) (summary) (Judge Joel Wohlfeil). |
|---|---|---|
| **9.** *Cnty. of San Diego* ("*San Diego I*"), No. 12-CV-01684-IEG MDD, (S.D. Cal.) [SI 46]. | Rogers presented conclusive evidence in *Tipton II*, but the judge was "racist," "blind or dumb," and "asleep." Dkt. No. 1 [SI 47] (July 6, 2012), *amended*, Dkt. No. 17 [SI 49] (Jan. 24, 2013). | Dismissed with prejudice as to the judge, and dismissed with prejudice as to others after failure to amend adequately. Dkt. No. 16 [SI 48] (Jan. 2); Dkt. No. 20 [SI 50] (Apr. 15, 2013) (Judge Irma Gonzalez). |
| **Note:** Rogers declared vexatious in California. *Tipton III*, No. 37-2012-00066620-CL-PO-EC, ROA No. 70 [SI 40–41] (Cal. Super. Ct. Cnty. San Diego Sept. 28, 2012) (J. Wohlfeil). | | |
| **10.** *Cnty. of San Diego* ("*San Diego II*"), No. 13CV1579H DHB, (S.D. Cal.) [SI 52]. | *See San Diego I.* "Re-filed" to correct what anyone with "half-of-a brain" would have gotten right the first time. Dkt. No. 1 [SI 53] (July 5, 2013). | Dismissed with prejudice *sua sponte* on grounds of claim preclusion; *in forma pauperis* status denied as moot. Dkt. No. 4 [SI 54] (July 22, 2013) (Judge Marilyn Huff). |
| **11.** *Apartment Mgmt. Consultants, LLC* ("*AMC IV*"), No. 37-2013-000 72861-CU-FR-CTL (Cal. Super. Ct. Cnty. San Diego) [SI 24]. | *See AMC I, II, III.* ROA No. 1 [SI 25] (Oct. 24, 2013), *amended*, [SI 26] (Jan. 29, 2015). | Dismissed with prejudice after defendants' demurrer. (Rogers did not request to file litigation pursuant to prefiling order, but this was not mentioned in dismissal.) Dkt. Nos. 88 [SI 28] (July 6, 2015) (Judge Katherine Bacal). |
| **12.** *Caballero*, No. 15CV1004 DMS MDD (S.D. Cal.) [SI 57]. | Rogers wanted to drive an old car but the state did not waive a smog check nor award a $500 stipend to buy parts the state said were needed and Rogers did not want to use anyways — all against Section 1983. Dkt. No. 1 ¶ 45 [SI 58] (May 5), *amended*, Dkt. No. 29 [SI 60] (Nov. 30, 2015). | Dismissed with prejudice after plaintiff failed to oppose a renewed motion to dismiss, which itself came after plaintiff re-filed substantially the same complaint as earlier dismissed. Dkt. No. 22 [SI 59] (Oct. 21, 2015) (dismissal with leave to amend); Dkt. No. 34 [SI 61] (Mar. 4, 2016) (dismissal with prejudice) (Judge Dana Sabraw). |

| | | |
|---|---|---|
| **13.** *City of San Diego* ("*A-to-Z I*"),[4] No. 37-2016-00009131-CU-PN-CTL (Cal. Super. Ct. Cnty. San Diego) [SI 63] | Rogers wanted to keep driving amid *Caballero*, so used "alternative license plates" — but car was damaged when racist police removed "false tags" and A to Z towed it.  ROA No. 1 [SI 64] (Mar. 18, 2016). | Dismissed with prejudice upon failure to appear and to show cause why no prefiling request was submitted. ROA No. 28 [SI 65] (July 1, 2016) (Judge Joel Pressman). |
| **14.** *Robert Half Corp.* ("*Robert Half I*"), No. CGC 16-551854 (Cal. Super. Ct. Cnty. S.F.) [SI 94], *aff'd* ("*Robert Half I App.*"), No. A151655 (Cal. App. 1st). | Rogers applied for a job in the Bay Area but was not hired because he is black. ROA No. 1 [SI 95] (May 6), *amended*, ROA No. 19 [SI 98] (Sept. 9, 2016) (adding employer). | Dismissed with prejudice as to employees (after failure to serve amended complaint); adjudged summarily in favor of employer and against Rogers, who lacked evidence. (Not noted: No prefiling request.) *See* ROA No. 15 (Sept. 8) (employees); ROA No. 24 (Oct. 14, 2016) (caption); ROA No. 60 [SI 99] (Apr. 21, 2017) (employer) (Judge Harold Kahn), *aff'd*, No. A151655 [SI 101] (Cal. App. 1st May 29, 2019). |
| **15.** *City of San Diego* ("*A-to-Z II*"), No. 37-2016-00030814-CU-PT-CTL (Cal. Super. Ct. Cnty. San Diego). | *See A-to-Z I.*  Paragraph 19 called tow-truck driver "a big, fat, nasty, disgusting, lazy Mexican." ROA No. 1 [SI 75 Attach.](Aug. 25, 2016). | Rejected prefiling request because "[p]aragraph 19 of the proposed complaint reveals this action is filed for an improper purpose." ROA No. 7 [SI 75] (Aug. 29, 2016) (Judge Timothy Taylor). |
| **16.** *RoadOne West* ("*A-to-Z III*"), No. 37-2016-00035889-CU-PA-NC (Cal. Super. Ct. Cnty. San Diego) [SI 76]. | *See A-to-Z I, II.* ROA No. 1 [SI 77] (Oct. 13, 2016). | Dismissed without prejudice for lack of prefiling request, citing Judge Wohlfeil's and Judge Taylor's orders. ROA No. 37 [SI 78] (Feb. 24, 2017) (Judge Robert Dahlquist). |
| **17.** *A to Z Enters.,Inc.* ("*A-to-Z IV*"), No. 37-2017-00022058-CU-PT-NC (Cal. Super. Ct. Cnty. San Diego). | *See A-to-Z I, II, III,* filed attesting this was the first-filed action. ROA No. 1 [SI 79] (June 13, 2017). | Rejected prefiling request for lack of jurisdiction and as "Judge Timothy Taylor previously denied [it]." [SI 80] (June 15, 2017) (Judge Robert Dahlquist). |
| **18.** *A-to-Z Inc.* ("*A-to-Z V*"), No. 37-2017-00351545-SC-SC-CTL (Cal. Super. Ct. Cnty. San Diego) [SI 81]. | *See A-to-Z I, II, III, IV,* ROA No. 1 [SI 82] (July 24, 2017). | Dismissed without prejudice (and no written decision) after parties appeared for a small claims trial. (Rogers did enter prefiling request.) [SI 83] (Nov. 14, 2017) (Temp. Judge Little). |

---

[4]  "*A-to-Z*" used to distinguish *San Diego*, though A to Z not named in this first case in the series.

| | | |
|---|---|---|
| **19.** *Robert Half Int'l,* ("*Robert Half II*") No. CV 17 3777 PJH (N.D. Cal.) [SI 102]. | *See Robert Half I.* Dkt. No. 1 [SI 103] (June 30, 2017). | Dismissed with prejudice as collaterally estopped, after staying case until end of *Robert Half I.* Dkt. No. 29 [SI 104] (Oct. 27, 2017) (staying case and mooting dismissal); Dkt. No. 31 [SI 106] (July 18, 2019) (dismissing with prejudice) (Judge Phyllis Hamilton). |
| **20.** *A-to-Z Inc.* ("*A-to-Z VI*"), No. 37-2017-00351545-SC-SC-CTL (Cal. Super. Ct. Cnty. San Diego).[5] | *See A-to-Z I–V.* ROA No. 16 [SI 84] (Dec. 19, 2017). | Rejected prefiling request, finding Rogers "lacks insight into his conduct and has not persuaded the Court his current claim is meritorious." ROA No. 17 [SI 85] (Dec. 21, 2017) (Judge Timothy Taylor). |
| **21.** *A to Z Enters., Inc.* ("*A-to-Z VII*") No. 37-2018-00005091-SC-SC-CTL (Cal. Super. Ct. Cnty. San Diego) [SI 86]. | *See A-to-Z I–VI.* ROA No. 1 [SI 87] (Jan. 26, 2018), *request to file litigation*, ROA No. 2 [SI 88] (Jan. 18, 2018). | Dismissed with prejudice — after granting the petition to file without explanation — and after small claims trial; request to cancel judgment denied. ROA No. 3 [SI 89] (Feb. 5); ROA No. 16, 17 [SI 90, 91] (May 22) (Temp. Judge Edward Carnot); ROA No. 25 [SI 93] (Nov. 7, 2018). |
| **22.** *City of San Diego* ("*A-to-Z VIII*"), No. 18CV2746 WQHMDD (S.D. Cal.) [SI 69]. | *See A-to-Z I–VII.* Dkt. No. 1 [SI 70] (Dec. 6, 2018), *amended* — and appending letter re "ridiculous errors" of the <u>agent of defense</u> district judge — Dkt. No. 5 [SI 72] (Feb. 12, 2019). | Dismissed without prejudice after noting first amended complaint made only five small changes from the earlier dismissed complaint; approved *in forma pauperis* status, but moot. Dkt. No. 3 [SI 71] (Jan. 8) (re Compl.); Dkt. No. 6 [SI 73] (Mar. 19, 2019) (re Amd.) (Judge William Hayes). |
| **23.** *City of Grover Beach* ("*John Boys*"), No. 18-cv-10590-PSG-ADS (C.D. Cal.) [SI 107]. | Three days after his car was towed in the *A-to-Z* cases, Rogers's car was towed by racist City of Grover Beach police and John Boys towing. Dkt. No. 1 [SI 108] (Dec. 21, 2018). | Dismissed with prejudice as time-barred, on a motion Rogers failed to oppose; approved *in forma pauperis* status, but moot. Dkt. No. 35 (Sept. 29, 2020) (Judge Philip Gutierrez). |
| **24.** *Fed. Home Loan Bank of S.F.*, ("*Bank of S.F.*") No. C 19- 01978 SI, (N.D. Cal.). | Rogers applied for a job in the Bay Area but was not hired because black. Dkt. No. 1 (April 12, 2019). | Dismissed with prejudice after Rogers produced no evidence in his favor. Dkt. No. 52 (May 26, 2020) (Judge Susan Illston). |

---

[5] Note this petition to initiate an unlimited action was filed on the *A-to-Z V* small claims docket.

United States District Court
Northern District of California

| | | |
|---|---|---|
| **Note:** Motion to declare Rogers vexatious in the Northern District denied. *Bank of S.F.*, No. C 19- 01978 SI, Dkt. No. 29, 2019 WL 6311393, *6–7 (N.D. Cal. Nov. 25, 2019). | | |
| **Note:** Motion to vacate Rogers's prefiling order in California granted. *Tipton III*, No. 37-2012-0006620-CL-PO-EC, ROA No. 94 (Cal. Super. Ct. Cnty. San Diego May 19, 2023). | | |
| **25.** *Low Income Investment Fund* ("*LIIF*"), No. C 23-02756 WHA (N.D. Cal.). | Rogers applied for a job in the Bay Area but was not hired because he is black. Dkt. No. 1 (June 2, 2023). | Summary judgment in favor of defendants; sanctions awarded and lien imposed for plaintiff's bad-faith, extortionate settlement demands. Dkt. No. 90 (Dec. 21, 2024) (the instant case). |
| **26.** *City of Dublin*, No. 23CV035915, (Cal. Super. Ct. Alameda Cnty.). | Rogers applied for job in Bay Area but — after filing a charge of racism with EEOC — he learned no one had been hired and alleged the job posting was fraudulent. ROA No. 1 (June 14), *amended*, ROA No. 12 (Aug. 25), *amended*, ROA No. 22 (Oct. 20, 2023). | Dismissed voluntarily after Judge Eumi Lee, then on state bench, pointed out that plaintiff's second amended complaint was filed without leave, that defendant's demurrer to plaintiff's purportedly facially defective first amended complaint was still pending, and that proof of service was incomplete. ROA No. 30 (Jan. 8, 2024) (update); ROA No. 32 (Feb. 29, 2024) (dismissal) (Judge Eumi Lee). |
| **27.** *City of San Francisco*, No. 23-cv-04997-JCS (N.D. Cal.). | Rogers applied for a job in the Bay Area but was not hired because he is black. Dkt. No. 1 (Sept. 28, 2023), *amended*, Dkt. No. 32 (Apr. 5, 2024). | Pending. Recently, "[t]he Court asked Defendant to file a statement explaining their settlement position and why they believe Plaintiff does not have a case so he can understand their reasoning." Earlier, plaintiff's emotional distress claims were dismissed with prejudice, while punitive damages were not foreclosed as a matter of law. Dkt. No. 27 (Feb. 23, 2024) (partial dismissal); Dkt. No. 55 (Jan. 15, 2025) (Judge Joseph Spero). |

Several of these lines of cases prompted state and federal judges to consider declaring Rogers vexatious. Because those judges' analysis can inform this order's, it reviews them next.

United States District Court
Northern District of California

12

### 2.    THE STATE COURT VEXATIOUS LITIGANT DECISION.

Over ten years ago, a state superior court in San Diego found Rogers vexatious.  This came after Rogers had filed his third state-court *Tipton* case about the car shop and his first federal-court *San Diego* case about the *Tipton* cases.  This order reviews that case history, Judge Joel Wohlfeil's order, and its recent vacation.

#### A.    THE STATE CASES ABOUT THE TIPTON SHOP (2011–2012).

From 2011 to 2012, Rogers serially filed three actions against a car shop arising from a service visit that allegedly left what Rogers said "appeared to be a smudge of dirt" but he said was actually a "chemical residue" on his car's trunk:  one action in state superior court that terminated against Rogers when he failed to respond to discovery requests (awarding defendants $925 in fees and costs), a second action in small-claims court that ended in Rogers's favor (awarding $280 in damages fully offset by the $925 in the first matter), and a third action in Rogers's words "re-file[d]" in state superior court where Rogers sought all over again the greater damages award Rogers still believed he deserved, this last case dismissed by Rogers after defendant moved for sanctions.  *Tipton I* (unlimited action filed Mar. 9, 2011); *Tipton II* (small claim filed Nov. 18, 2011); *Tipton III* (unlimited action filed Apr. 6, 2012).

Rogers's response to the small-claims outcome was to accuse those who decided the issue against him of racism, while seeking to reopen the issues decided.  In his request to correct judgment, Rogers argued in part (nits original):

> #6)  I believe this [$280] judgment [in my favor] was based purely on race and color.  The judgment was entirely a racist decision on the part of the judge.  because he <u>did not</u> consider the Plaintiff's <u>FACTUAL</u> information because plaintiff is African American and the defendants are Caucasian.

> #7)  Plaintiff will re-file this case in Superior Court and seek damages of $1,475.00 plus punitive damages of $2,000[, sums already denied].

> #8)  The judge was in such a hurry that he could not possibly hear all the facts.  And draw a proper conclusion.

> #9)  The judge was completely dillusional about the Actual Facts in this CASE and about the LAW in California . . . .

*Tipton II*, ROA No. 26.

13

1

**B.** **THE FEDERAL CASES AGAINST SAN DIEGO FOR CONDUCT**
**IN THE STATE CASES ABOUT TIPTON (2012–2013).**

2

In 2012 — still prior to the vexatious litigant order — Rogers then filed the first of two

3

federal suits alleging that the state proceedings had been warped by racism.  Rogers alleged

4

that, because Rogers is black, small-claims Judge Lantz Lewis had awarded Rogers only $280

5

in damages and that the San Diego County sheriff had applied that $280 towards the $925 that

6

Rogers already owed.  *See* Compl., *San Diego I*, Dkt. No. 1 (S.D. Cal. filed July 6, 2012).

7

Rogers complained in part (nits original):

8

> Hon. Judge Lantz Lewis  behavior is "sloppy", "wreckless",
> "careless", "incompetent", and defamatory to Plaintiff's ethnic

9

> race in a manner that diminishes rulings and judgments  that are
> impartial and racially biased. This case in Small Claims court

10

> comes under Tort law.

11

> To prove the damage, Plaintiff handed Judge Lantz Lewis  the
> pictures of the damage to the vehicle. After the judge was looking

12

> over the pictures he continues to say  "I don't understand the
> pictures" and "I don't understand  where the damage is". Plaintiff

13

> even pointed it out to him and he continued to act as though he was
> either blind or dumb.

14

15

> . . . Judge Lantz Lewis even refused to vacate the judgment by
> stating on the form that Plaintiff " refused to let the defendant

16

> correct the error which was unreasonable". The Plaintiff just
> explained to him that he did not want the defendant to do any more

17

> work on the vehicle. The racist judge even ignored this
> information. There was nothing unreasonable about the damage

18

> estimate that Plaintiff gave the judge.  This judge simply attempts
> to disguise his racist feelings through judgments that favor white

19

> defendants over ethnic minorities regardless of the evidence that is
> presented.

20

> Judge Lantz Lewis' Non-performance of judicial functions
> includes sleeping on the bench.  The judge was essentially half

21

> asleep during the court proceedings.

22

*Id.* at 6–7.  Ultimately, United States District Judge Irma Gonzalez found Judge Lewis

23

immune, and — after Rogers failed to adequately amend his complaint — dismissed the

24

remaining claims with prejudice.  *See* Order, *San Diego I*, Dkt. No. 16 (S.D. Cal. Jan. 2, 2013);

25

*id.*, Dkt. No. 20 (S.D. Cal. Apr. 15, 2013).

26

Rogers then re-filed the same claims in a second action in the Southern District of

27

California, adding text to explain why the first action had been wrongly decided:

28

1

2

3

> This is <u>NOT</u> a complicated case to understand. A person with a
> fourth grade education with 'half-of-a brain' could under this case.
> But [District Judge] Irma E. Gonzalez, is ill-prepared to resolve
> this matter in a competent manner.

4    Compl. at 2, *San Diego II*, Dkt. No. 1 (S.D. Cal. filed July 5, 2013). The action was dismissed

5    *sua sponte* with prejudice when yet another judge found all claims issue-precluded. *Id.*, Dkt.

6    No. 4 (S.D. Cal. filed July 22, 2013) (Judge Marilyn Huff).

7             **C.    THE STATE-COURT VEXATIOUS LITIGANT ORDER (2012)
                     AND ITS EFFECT (2012–2023).**

8

9    Back in the state-court *Tipton III* proceedings, state Judge Wohlfeil declared Rogers

10   vexatious. ROA No. 70 [SI 40–41] (Cal. Super. Ct. Cnty. San Diego Sept. 28, 2012). Judge

11   Wohlfeil's order emphasized that Rogers had sought to relitigate settled claims across the three

     cases and within each. *Ibid.*; *see also* Minute Order, *Tipton III*, ROA No. 75 (summarizing).

12
     Notwithstanding the prefiling order, Rogers continued to file or seek to file cases in state
13
     court (setting aside his federal filings), including:
14

15        •   the six *A-to-Z* actions regarding one tow of his car;

16        •   the fourth *AMC* action regarding his prior landlord; and,

17        •   the multiple actions alleging discrimination in hiring by
              prospective employers, discussed below.

18   In the majority of the state-court cases, Rogers failed to follow the prefiling order. Judge

19   Wohlfeil's order "prohibited [Rogers] from filing any new litigation in propia persona in the

20   courts of California without approval of the presiding judge of the court in which the action is

21   to be filed." Of the state-court matters filed by Rogers where that order would have applied:

22        •   three concluded without apparently uncovering that Rogers had
              failed to file a prefiling request (*AMC IV*, *Robert Half I*, *A-to-Z V*);
23

24        •   two concluded after uncovering that Rogers had failed to file a
              prefiling request (*A-to-Z I*, *A-to-Z III*);

25        •   three concluded when Rogers's prefiling request was rejected (*A-
              to-Z II*, *A-to-Z IV*, *A-to-Z VI*); and,
26

27        •   one concluded when Rogers's prefiling request was granted, which
              was done without a reasoned decision and enabled dismissal with
28            prejudice (*A-to-Z VII*).

United States District Court
Northern District of California

1    Why were his prefiling requests rejected?  One order pointed to one of Rogers's proposed

2    complaint's racist caricatures of a defendant to find Rogers's case was improperly motivated.

3    *A-to-Z II*, ROA No. 7 [SI 75] (Cal. Super. Ct. Cnty. San Diego Aug. 29, 2016) (Judge Timothy

4    Taylor).  Another emphasized Rogers's "lack[ of] insight into his conduct" as a repeat litigant.

5    *A-to-Z VI*, ROA No. 17 [SI 85] (Cal. Super. Ct. Cnty. San Diego Dec. 21, 2017) (Judge

6    Timothy Taylor).

7                    **D.    THE VACATION OF THE VEXATIOUS LITIGANT ORDER.**

8           Only after Rogers redirected his litigation to federal courts and farther north — and after

9    four applications to vacate — did Judge Wohlfeil vacate Rogers's state-court prefiling order.

10          In July 2017, Rogers first applied for an order to vacate.  He argued that "I never should

11   have been placed on the Vexatious litigant list."   He claimed that he "never filed a third case"

12   against *Tipton* and that he had "just [been] trying to obtain money damages" due him in *Tipton*

13   *II* when he was declared vexatious.  *See* Appl., *Tipton III*, ROA No. 81.  But Rogers filed this

14   request onto the docket he had opened by filing *Tipton III*.  And, Rogers had been declared

15   vexatious in part because he had refused to accept that he would not pocket damages from

16   *Tipton II* because they had been applied towards his debt from *Tipton I*.  Notably, Rogers also

17   failed to disclose — as the form required — that he had filed new litigation in California

18   courts:  He had filed *A-to-Z V* the day before.  Judge Timothy Taylor stated, "Mr. Rogers does

19   not accept responsibility for his previous conduct."  Order, *Tipton III*, ROA No. 82 (Cal.

20   Super. Ct. Cnty. San Diego July 27, 2017).

21          In January 2019, Rogers made his second request.  Judge Joel Wohlfeil denied the

22   request because Rogers submitted "No Application with explanation why Court should vacate

23   prefiling order."  Order on Appl., *Tipton III*, ROA No. 88 (Cal. Super. Ct. Cnty. San Diego

24   Jan. 10, 2019) (mistitled on register) (stating in margin that Rogers's precipitating request was

25   received January 7, 2019).

26          In August 2019, Rogers made his third request.  He attested that "I have not made an

27   application for an order to vacate a prefiling order in the last 12 months," which was false.

28   Then he repeated his arguments from his first application.  Finally, he said the prefiling order

United States District Court
Northern District of California

"serves no purpose when all the judges will do is override the pre-filing order and allow a future filing to move forward and continue." Appl., *Tipton III*, ROA No. 89. But the record supports that Rogers had applied as recently as January. And, in any case, the arguments Rogers had made in his first application remained unavailing. Finally, Rogers took the wrong lesson from the one instance where he had received prefiling approval: After six false-starts in the *A-to-Z* saga, a grant of Rogers's prefiling request in the seventh *A-to-Z* case led to a (more) conclusive dismissal with prejudice (Rogers later filed an eighth, in federal court). With this context but without a reasoned decision, Judge Eddie Sturgeon denied Rogers's application for an order to vacate. *Tipton III*, ROA No. 90 (Cal. Super. Ct. Cnty. San Diego Sept. 9, 2019).

Four years later, in May 2023, Rogers applied a fourth time. He repeated arguments about the *Tipton* matter. He then said "[t]he STATE OF CALIFORNIA Vexatious Litigant law violates the petitioner's 14th Amendment constitutional rights." Finally, he emphasized his prefiling order was imposed "over 12 years ago," and that he had not filed new litigation in the last five years. Appl., *Tipton III*, ROA No. 93. Rogers's characterization of the *Tipton* cases remained false. His characterization of California's vexatious litigant law as unconstitutional went against settled law. *Wolfe v. Strankman*, 392 F.3d 358, 361 (9th Cir. 2004) (collecting cases, including *Childs v. PaineWebber Inc.*, 29 Cal. App. 4th 982 (1994)).

But Rogers's statement that he had not filed new cases in the last five years appeared to be true — for the very first time — at least as to state-court cases. This last factor thus likely proved dispositive. In 2017 and 2019, Rogers's applications to vacate had followed on the heels of requests to file new litigation. In 2023, Rogers's application did not follow any request to file new litigation (in state courts, at least). Rogers by that point had redirected his prodigious litigation energies to the federal courts, and farther north. In a form order without a reasoned decision, Judge Wohlfeil vacated Rogers's state-court prefiling order. Order on Appl., *Tipton III*, ROA No. 94 (Cal. Super. Ct. Cnty. San Diego May 19, 2023).

### 3. THE FEDERAL COURT VEXATIOUS LITIGANT DECISION.

Over five years ago, while Rogers's state-court prefiling order remained in effect, a federal judge in our district also considered whether Rogers is vexatious. After Rogers filed

17

United States District Court
Northern District of California

conspicuously similar employment claims in *Robert Half II* and *Bank of San Francisco*, Judge Illston considered but rejected a motion to impose a prefiling requirement. She called it a "close case." Soon after, Rogers lost his substantive case before Judge Illston and filed three more conspicuously similar employment claims, in *City of Dublin*, *Low Income Investment Fund*, and *City of San Francisco*. All these cases relate to far-earlier employment suits brought by Rogers, *Bank of America* and *Previo*, which likewise alleged that he applied to a job but was not hired because he is black. This order reviews Rogers's employment discrimination cases filed in our district prior to Judge Illston's order, the order itself, and Rogers's similar filings after the order.

### A. THE PRIOR EMPLOYMENT CASES (1993–2019).

It appears that Rogers graduated from college in December 1993 with a degree in business administration (Dkt. No. 74, Exh. D). Rogers has received no further professional education. Rogers Feb. 22, 2020 Dep. Tr. 31, *Bank of S.F.*, Dkt. No. 48-1, Exh. 2.

#### (i) Santa Clara County (1993).

In 1993, Rogers applied for a summer job with Santa Clara County, but was rejected. He filed a charge with the United States Equal Employment Opportunity Commission alleging race discrimination. Rogers later admitted that he did not believe he was treated differently because of his race, but filed the charge because "I should have been given more opportunity." *See* Rogers July 28, 2000 Dep. Tr. 13–14, *Bank of Am.*, Dkt. No. 50, Exh. H.

#### (ii) Bank of America (1999–2001).

Between 1994 and 1999, Rogers claimed to have held at least nine roles, most ending within one year (with dates according to conflicting records indicated in superscript)[6]:

---

[6] For temp roles by date, see Plaintiff's Evidence, *Robert Half I*, ROA No. 51, Exh. A at 11/21 (Cal. Super. Ct. S.F. Cnty. Apr. 4, 2017). For more on contractor versus employee roles, see Rogers February 22, 2020 Deposition Transcript at 108–09, *Bank of S.F.*, Dkt. No. 48-1, Exh. 2. This order counts "nine" roles to avoid double-counting at Robert Half, a temp agency which placed Rogers in other roles. Rogers July 28, 2000 Dep. Tr. 80, *Bank of Am.*, Dkt. No. 50, Exh. H. For marked resumes, see them here:
- **BoA**: Pl.'s Reb. Def.'s MSJ, *Bank of Am.*, Dkt. No. 56, Exh. 3;
- **RH**: Pl.'s Evid. in Opp. to Def.'s MSJ, *Robert Half I*, ROA No. 51, Exh. C;
- **RHv2**: *Id.* Exh. A at 21/21;
- **RHv3**: *Id.* Exh. B at 5 of 13;

- 1994, Kaufman & Broad Mortg. Co., Mortgage Funder
  (stated as "1994-1995"[BoA] or "1994"[RH; BoSF; LIFF]);

- 1994 to 1997, Robert Half Corp., Accounts Receivable (Temp)
  (15+ placements from 1994 to 1997, or "1996-1998"[BoA])

- 1995 to 1996, Apollo Group Corp., Financial Aid Representative
  ( "1996 to -"[RH] or "1995-1996"[BoSF; LIIF]);

- 1995, LifeGuard HMO, Accounts Receivable Analyst (Temp)
  (61 days via Robert Half, or "1995 -"[RH], or "1995"[BoSF; LIFF])

- 1995, University of Phoenix, Financial Aid Coordinator (Temp)
  (154 days via Robert Half, "1995-1996"[RHv2], or "1996"[BoA]);

- 1995 to Present, Centium, Inc., Various Roles/Titles
  ( "01/1995"[RHv3] or "2002 – Present"[RH; LIIF] or "2001-Current"[BoSF]);

- 1996, ATARI Corp., Accounts Receivable
  ("1996"[RHv2] or "1997 -"[RH; LIIF]);

- 1997, Speiker Properties, Inc., Accountant (Temp)
  (90+ days via Robert Half or "1997"[RHv2]);

- 1998, Waste Management Inc., Accounting Clerk[BoSF] (Temp); and,

- 1999 to 2000, Panasonic Corp., Accounts Payable (Temp)
  (stated as "1999 -"[RH] "1999-2000"[BoSF; LIFF]).

Then, in January 1999, Rogers interviewed by phone and again in person for a role at Bank of America.  "To make myself marketable," Rogers did not "see anything wrong with" submitting a resume showing that he had worked at Kaufman & Broad Mortgage Company for nearly two years — when in truth he had worked there for a little over two months.  Rogers July 28, 2000 Dep. Tr. 64–65, *Bank of Am.*, Dkt. No. 50, Exh. H.  His submitted resume included only three of the above roles.  Because the resume suggested Rogers might be a fit and his telephone screening interview did not raise flags, Rogers was invited to an in-person interview.  Chambard Decl. ¶¶ 12, 27, *Bank of Am.*, Dkt. No. 49 (screener).

At the Bank of America interview, Rogers evaded questions about his past experience — leading his interviewer to believe he had not performed the work claimed on his resume.  Cantrell Decl. ¶ 7, *Bank of Am.*, Dkt. No. 48 (interviewer).  Indeed, Rogers later said that he

- **BoSF**:  Pl.'s MSJ, *Bank of S.F.*, Dkt. No. 47-1, Exh. C; and
- **LIFF**:  Pl.'s Decl. ISO Opp. MSJ, *LIIF*, Dkt. No. 74, Exh. B.

19

may have told his interviewer that he had not worked the full dates stated on his resume. Rogers July 28, 2000 Dep. Tr. 64–65.  The bank stated that it chose not to hire Rogers because he lacked experience, enthusiasm, and professional skills like punctuality (two declarants said he had arrived so late he missed his initial interview slot).  Cantrell Decl. ¶¶ 8–10.  When Rogers received a form rejection letter, he called the screener and "swore" at her.  Chambard Decl. ¶ 23.

Rogers later acknowledged that there was nothing specific about the application process or any interviewer that struck him as racist — except the result.  *See* Rogers July 28, 2000 Dep. Tr. 94, 95, 123.  The closest Rogers came to stating otherwise while under oath was as follows:

> **Q [Counsel for Bank of America].**  Did anyone [from the bank] make any comments to you that you felt were racist?
>
> **A [Rogers].**  I'm going to object.
>
> **Q.**  There's no objection for this kind of question.
>
> **A.**  I'm going to object.
>
> **Q.**  There's no objection to this kind of question.  I want to know whether any comment was made to you that you felt was racist.  Do you have any knowledge of any kind of comments that you felt were racist?
>
> **A.**  I don't want to answer.
>
> **Q.**  Why don't you want to answer?
>
> **A.**   Because I don't want to.
>
> **Q.**  Mr. Rogers, I will move to compel on this question and I will have the [San Francisco court where you filed suit] bring you back up from San Diego to sit here and answer this question.  I suggest you really think about answering this.  This is your opportunity to tell me why you believe that the bank discriminated against you racially.  If you don't tell me this you can't introduce evidence into this later.  You've brought a race discrimination claim against the bank.
>
> **A.**  What was the question again?
>
> **Q.**  My question is:  Did anyone at the bank make any comments to you that you felt was racist?
>
> **A.**  I don't believe they did.

1    **Q.** Did anyone at the bank ask you any question that you felt was
inappropriate?

2    **A.** No.

3    **Q.** Besides the fact that you did not ultimately get the job with the
bank, do you have any reason for believing anyone at the bank
4    harbors racial bias?

5    **A.** Yes.

6    **Q.** What are your reasons?

7    **A.** Just based on their interviewing process.

8    **Q.** What do you mean by that?

9    **A.** The events that led up to my reasoning for not getting the job.

10   **Q.** I want to understand what the factual basis is for your belief
that someone at the bank might have a racial bias.  If there's
11   something besides the fact that you didn't get the job that makes
you think that the bank has some sort of race bias, that's what I
12   want to know.

13   **A.** Yes, there is.

14   **Q.** Tell me what it is that makes you believe that someone at the
bank has a racial bias.
15

16   **A.** Based on [the interviewer], the way he interviewed me [in
person].

17   **Q.** How about how he interviewed you?

18   **A.** It's his decision making.  That's what I mean.

19   **Q.** So the decision - -

20   **A.** The decision not to hire me was based on my race.

21   **Q.** Why is it that you feel that?  That's my question.

22   **A.** It's because of the way he interviewed me.  He only spent four
to six minutes with me.  He was in a rush.  He lied to me.  He said
23   it would take - -

24   **Q.** Excuse me.  How did he lie to you?

25   **A.** He told me that it would be seven days before I would be
notified, and the decision not to hire me was actually made the
26   next day.

27   *Id.* at 94–97.  Rogers summarized:  "At the time of the interview, it did not seem that racial

28   bias was an issue."  Pl.'s Undisputed Facts ¶ 18, *Bank of Am.*, Dkt. No. 56, Attach.  Ultimately,

Rogers developed "no evidence whatsoever — no comments or conduct, statistics, or pattern or practice — [to] raise any doubt as to the Bank's explanation" for not hiring him:  He lacked experience and interviewed poorly.  Def.'s MSJ at 2, *Bank of Am.*, Dkt. No. 46.  As it turns out, Bank of America attested that 15 of the 63 persons who at the time were hired or transferred into the type of role for which Rogers applied were black.  *Id.* at 6 (citing declaration).

Nonetheless, Rogers brought a charge before the United States Equal Employment Opportunity Commission.  In September 1999, the EEOC completed its investigation and found "no cause."  Notice of Suit Rights, *Bank of Am.*, Dkt. No. 1, Attach.

In December 1999, Rogers brought suit in federal court seeking "$33 million" in damages.  Defendants answered without moving to dismiss.  Then, near the dispositive motion deadline, Rogers wrote the magistrate judge that he had refused a proposed settlement because it would have allowed the bank to "avoid any financial liability":

> Dear Hon. [Bernard] Zimmerman:
>
> On November 13, 2000, you received a letter from [opposing counsel] that stated that this matter has been settled.  However, there has been no settlement as of this date.  Both parties met on November 7, 2000 for a settlement conference.  However, the ENE evaluator, [a lawyer,] was extremely "partial and sympathetic" to Bank of America.  This ENE evaluator did nothing to look at all the evidence that has been gathered since this case began.  Furthermore, the defendant is desperate for a quick settlement to avoid any financial liability.  In addition, [the ENE evaluator's] law firm, Cooley Godward LLP, also represents Bank of America in litigation so she had a motive to be partial.
>
> Defendant has indicated that they will file a summary judgment in support of their defense.  However, case law strongly suggests the inappropriateness of this tactic in employment discrimination cases.  A summary judgment in their favor would mean an immediate petition for appeal to the Ninth Circuit Court of Appeals.
>
> This is a ploy by the defense to intimidate and threaten a pro se plaintiff to agree to a quick settlement that is unconscionable by avoiding any financial liability.  However, this will not work in this lawsuit.
>
> This case will be intensely and aggressively litigated moving forward !
>
> Sincerely,

United States District Court
Northern District of California

United States District Court
Northern District of California

1                Brian Rogers (pro per litigant)

2   Letter of Dec. 7, 2000, *in* Further Updated JCMS, *Bank of Am.*, Dkt. No. 42, Exh. C.  As a

3   result, a previously issued, contingent dismissal never triggered.  *See Bank of Am.*, Dkt. Nos.

4   36, 37.  And, because this sudden disagreement was communicated to the bank only after the

5   dispositive motion deadline had passed, the bank asked that the deadline be extended (it later

6   was).  Letter of Jan. 9, 2001, *Bank of Am.*, Dkt. No. 38; *see also* Letter of Jan. 18, 2001, *Bank*

7   *of Am.*, Dkt. No. 41.  In response, Rogers wrote that the bank's counsel "is an incompetent,

8   inexperienced, and highly unprofessional attorney.  Further, she is completely overwhelmed by

9   this case."  Letter of Jan. 12, 2001, *Bank of Am.*, Dkt. No. 40.  The bank raised the possibility

10  of seeking sanctions, and said settlement was "*extremely unlikely*."  Letter of Jan. 18, 2001 (re

11  sanctions); Further Updated JCMS at 7 (prospects).

12           The parties briefed summary judgment, and the district judge ordered a hearing date,

13  which was extended one week.  *Bank of Am.*, Dkt. No. 55.  After Rogers's request to revert to

14  the earlier date was denied, he wrote to the district judge with a unilateral request "to end this

15  case effective immediately":

16           Dear Hon. [Martin] Jenkins:

17           On March 30, 2001, Plaintiff received a letter indicating that Court
             refuses to honor his request to have the Motion for Summary
18           judgment moved back to April 10, 2001.  Therefore, since Plaintiff
             cannot continue to "play games" with the federal court system, the
19           judge, and Bank of America, the Plaintiff ("Brian Rogers") wishes
             [to] remove the case from trial and end this case effective
20           immediately.

21           Plaintiff clearly lacks the time to handle the case effectively.  But
             also because the Plaintiff lives in San Deigo, 700 miles from the
22           Federal District Court [where Plaintiff filed the matter].  In
             addition, this would deplete the Plaintiff of his financial resources
23           to travel and make ridiculous special trips to San Francisco
             because of defenses' coercion and manipulation of the judge and
24           the federal court system.

25           Sincerely,

26           Brian Rogers.

27  Letter of Apr. 2, 2001, *Bank of Am.*, Dkt. No. 63.  Bank of America soon stipulated to Rogers's

28  otherwise unilateral dismissal, and Judge Jenkins dismissed with prejudice.  *Id.*, Dkt. No. 65.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### (iii)    Previo *(2001–2002).*

Between 1999 and 2001, Rogers claimed to have started at least four new roles (again with dates according to resumes or records as indicated in superscript, explained *supra* note 6):

- 1995 to "Present", Centium, Inc., G/L Accountant, Etc. ("01/1995"[RHsys] or "2002 – Present"[RH; LIIF] or "2001-Current"[BoSF]).

- 1999 to 2000, Panasonic Corp., Accounts Payable (or "1999 - "[RH; BoSF; LIIF]);

- 2000 to "-", AMN Healthcare, Accounts Receivable (or "2000 - "[RH; LIIF]); and

- 2001 to "-", Union Tribune, Collection Representative (or "2001 - "[RH; LIIF]).

Rogers's claimed role at Centium presents larger issues addressed further below.

Then, in January 2001 — while his *Bank of America* case was ongoing — Rogers interviewed for what would have been at least his twelfth claimed role since graduating college in 1994.  He was not hired.  Rogers said the interviewer asked him no "job-related technical questions" in a single, eight-minute interview.  *Previo*, Dkt. No. 1 (attaching state-court complaint, No. GIC-776937, ROA No. 1 (Cal. Super. Ct. Cnty. San Diego filed Oct. 25, 2001)).  Two weeks later, Rogers filed a charge with the United States Equal Employment Opportunity Commission; after obtaining a right-to-sue letter in August 2001, he brought suit in state court in October 2001.  *Ibid.*  Defendants removed and answered.  *Ibid.* (S.D. Cal. filed Nov. 29, 2001).

On plaintiff's motion to remand, the district judge reasoned in part as follows:

> [T]he Court is unclear whether Plaintiff wishes to "voluntarily dismiss" his federal claim because it lacks merit or because the Plaintiff wishes to seek redress in state court.  The Court is hesitant to dismiss Plaintiff's federal claim without further clarification due to possible res judicata and preclusion effects.  Furthermore, the Court is unclear as to the nature of Plaintiff's state law claims.

> Therefore, Plaintiff is granted leave to file an amended complaint clarifying his claims within thirty days.  If Plaintiff chooses not to do so, the Court will dismiss Plaintiff's federal claim as requested and remand any state law claims to state court for further proceedings, if any.

*Previo*, Dkt. No. 9 (citations omitted) (Judge Napoleon Jones, Jr.). Two days later, the parties reached an unspecified settlement in principle, *id.*, Dkt. No. 10, and within thirty days stipulated to dismissal with prejudice, *id.*, Dkt. No. 13. (Coincidentally, defense counsel in this case belonged to the same firm as the early neutral evaluator in *Bank of America*.)

This is the only discrimination case brought by Rogers to have ended in a stipulated dismissal reflecting a possible settlement.

### *(iv)* **Robert Half I *(2015–2019)*.**

Between 2002 and 2015, when our next action begins, Rogers continued to work at "Centium, Inc.," as its "G/L Accountant." Pl.'s Evid. in Opp. to Def.'s MSJ, *Robert Half I*, ROA No. 51, Exh. C. Recall we said Rogers's work at Centium required closer scrutiny. Rogers has attested that he is the sole owner and sole employee of Centium, runs it from his house, and has given himself "a lot of titles." Rogers Nov. 9, 2016 Dep. Tr. 70, *in* Evid. ISO Def.'s MSJ, *Robert Half I*, ROA No. 41, Exh. B. Centium first arose in litigation unrelated to employment in 2011, when Rogers was denied *in forma pauperis* status after failing to provide financial statements showing whether he had made money from Centium. *See* Order, *AMC II*, Dkt. No. 4 (S.D. Cal. Sept. 20, 2011) (Judge Larry Alan Burns). Centium soon became an issue in the next case litigated (and continued to be an issue in later cases).

In November 2015, Rogers submitted a resume for a position with the staffing firm Robert Half Corporation, which in the 1990s had placed him into short-term roles (*supra* note 6). He received a call and then an email inviting him to an interview and asking him to bring references. Rogers Nov. 9, 2016 Dep. Tr. 25–28. But Rogers did not bring references. *Id.* at 30. Instead, Rogers admitted at the interview that the company where he had been working — Centium — had no employees but himself. *Id.* at 31. The interviewer was taken aback and after brief further exchange ended the interview. *Id.* at 31–32. The interviewer "thought [Rogers]'s resume was misleading because [Rogers] was not merely a 'G/L Accountant' at Centium, Inc.; rather, as the owner and sole employee, he would have held all positions in the company." Op. at 2, *Robert Half I App.* (Cal. App. 1st Dist. May 29, 2019).

After the interview, Rogers emailed his interviewer as follows (nits original, throughout):

25

Doran,

I'm wondering why I have NOT been called up for any temp/contract positions since I met with you on Nov 20th. You told me to come down to YOUR offices on Nov 20th and meet with you and expect to spend 1 HOUR. But you only spent 7 minutes with me. Why ????

I spent a lot of time and money coming to your offices on Nov 20th and I expect more than this I Further, when I met with you and told you I had my own company your attitude changed. Then you said "I CAN'T HELP YOU" and then you said "Your more of a "Full Charge Bookeeper" and you want me to change my resume for no apparent reason. Then you say" I couldn't find your company name using a search. Why can't you call me up on the phone about this instead of sneaking around on the Internet which largely has inaccurate information ? If you want to know something about my company, call me up on the phone. That's what telephones are for.

WELL THE FACTS ARE:

I do have the full cycle accounting experience regardless of what you say or what you think. And my experience, credentials, and qualifications are most likely better than anybody that's walked in your office.

Most of your jobs are LOW-LEVEL positions that don't even require a college degree. And your trying to tell me that I'm not qualified for any of these positions. That sounds like discrimination to me.

Further, your attempting to have me provide references. You already have those references from the time I have worked with Accountemps in the past.

If you fail to contact me for open positions as I see them on your web site  and other job boards, a complaint will be filed against Robert Half and Accountemps with EEOC.

Brian Rogers

Email Dec. 9, 2015, *in* Pl.'s Evid. Opp. to Def.'s MSJ, *Robert Half I*, ROA No. 51, Exh. G. (Within Robert Half, Accountemps is a brand for finance- and accounting-related temp placements.)  The interviewer replied the same day and said he still needed updated references and a revised resume to be able to consider Rogers for any placements.  *Id.*, Exh. H.  Rogers continued to insist that references on file "[f]rom 1995 or '96 or whenever I started working for [Robert Half]" in temp roles should suffice in 2015.  Rogers Nov. 9, 2016 Dep. Tr. 40–41, 45.

In February 2016, Rogers filed a sex- and race-based discrimination charge with the United States Equal Employment Opportunity Commission. *See* Pl.'s Evid. in Opp. to Def.'s MSJ, *Robert Half I*, ROA No. 51, Exh. J. And, in May 2016, he brought an age- and race-based discrimination suit in state court. The gravamen of Rogers's complaint was that the interviewer assessed him as less-qualified than Rogers believed himself to be, with the assessment biased by Rogers's race:

> [The interviewer said,] "Your experience and qualifications is more suitable to a Full Charge bookkeeper position". A full charge bookeeper position is a much lower quality/ lower pay scale position in the Accounting/Finance profession relative to [Rogers]'s experience, skills, and education. In fact, you do not need to have a college degree to be a bookeeper. The reason [the interviewer] made this "off the cuff" comment is because [Rogers] is African American and he wishes to reserve the better positions for his white candidates. In furtherance and support of such a claim, [the interviewer] has still failed to notify [Rogers] verbally or in writing of any open positions through Robert half Corporation/Accountemps division as of May 5, 2016. Under information and belief, Robert Half Corporation has developed a policy of preventing and refusing to submit African American's to job assignments at their San Francisco office.

Compl. ¶ 15, *Robert Half I*, ROA No. 1.

The individual employee defendants demurred, arguing liability could attach only to employers, not employees — and the court sustained their motion. Order, *Robert Half I*, ROA No. 15 (Cal. Super. Ct. S.F. Cnty. Sept. 8, 2016) (Judge Harold Kahn). The dismissal as to the defendants was with prejudice unless Rogers timely amended and served a complaint. *Id.* at 2. No timely service was recorded, and the caption was soon corrected to show only the corporate defendant. *E.g.*, Notice, *Robert Half I*, ROA No. 24.

Rogers later acknowledged that he had no basis for believing he was discriminated against by Robert Half except that his interviewer believed him unqualified for the placements Rogers wanted. Again, the following deposition excerpt is emblematic:

> **Q [Counsel for Robert Half].** So you don't personally know anyone. Are you aware of anyone who believes that they have been discriminated against by Robert Half on the basis of race?
>
> **A [Rogers].** I am not aware of anybody else that has been discriminated against, personally.

United States District Court
Northern District of California

1

**Q.** Are there any documents that you believe support your race discrimination claim against Robert half?

2

3

**A.** I haven't finished my discovery yet.

4

**Q.** Okay. Are you currently right now aware of any documents that support your claim - - race discrimination claim against Robert Half?

5

6

**A.** I'd have to look at my file.

7

**Q.** So you don't - - currently right now today without looking at your files are your aware of any documents that support your claims of race discrimination against Robert Half?

8

9

**A.** I just - - I have to look at my files. I mean, I don't know what I have in them.

10

**Q.** I'm asking you, though, without looking at your files, your current knowledge right here today, are you aware of any documents that support your claim of race discrimination against Robert Half?

11

12

13

**A.** No.

14

**Q.** Do you believe that you may have documents in your file?

15

**A.** I may.

16

**Q.** What documents do you believe you have in your file?

17

**A.** Um, they might deal with statistics. Showing information regarding Robert Half's - - a number of people that they may have sent people out on jobs.

18

19

**Q.** And where did you obtain that document?

20

**A.** I said I may have it. I'm not saying I have it.

21

**Q.** Did you previously produce such a document to Robert Half?

22

**A.** No.

23

**Q.** Why did you not produce that document to Robert Half?

24

**A.** I said I don't have a document.

25

**Q.** Okay. Is there any other reason why you believe Robert Half discriminated against you?

26

**A.** No.

27

Rogers Nov. 9, 2016 Dep. Tr. 109–110, *Robert Half I*, ROA No. 41, Exh. B.

28

1    Defendants later moved for summary judgment — and the court granted the motion.

2    Order, *Robert Half I*, ROA No. 60 (Cal. Super. Ct. S.F. Cnty. Apr. 21, 2017) (Judge Harold

3    Kahn).

4    Judge Kahn found that "Mr. Rogers merely takes issue with RHI's business practices,"

5    and fails to "show[] that racial or age animus was a motivating factor." *Id.* at 2.

6    Rogers appealed. The appeals court affirmed:

> Plaintiff does not point to any evidence in the record disputing
> defendant's stated nondiscriminatory reason for not hiring
> him . . . . [Plaintiff] did not satisfy defendant's reasonable request
> for a recent reference. Moreover, plaintiff's disagreement with the
> need to provide any further references and a revised resume is not
> evidence that defendant acted with discriminatory animus, and it
> does not alter the fact that plaintiff did not provide either after
> being requested to do so.

12    Op. at 4–5, *Robert Half I App.*

13    ### (v)    Robert Half II *(2017–2019).*

14    In 2017, with the state appeal pending, Rogers re-filed substantially the same allegations

15    in federal court, adding another corporate defendant and seeking $788,000 in damages.

16    Compl., *Robert Half II*, Dkt. No. 1. Many paragraphs were identical.

17    The district court stayed the action. It reasoned that if the state appellate court affirmed

18    the state trial court's decision, then the federal district court would be collaterally estopped.

19    Order at 9, *Robert Half II*, Dkt. No. 29 (N.D. Cal. Oct. 27, 2017) (Judge Phyllis Hamilton).

20    After the state-court affirmance (above), the federal district court dismissed the parallel

21    action with prejudice. Order, *Robert Half II*, Dkt. No. 31 (N.D. Cal. July 18, 2019) (Judge

22    Phyllis Hamilton) (citing Dkt. No. 29).

23    ### (vi)    Bank of San Francisco *(2018–2020).*

24    Between 2015 and 2018, Rogers continued to work at "Centium, Inc.," in a role he now

25    listed as "A/P G/L Accountant" (accounts payable and general ledger). Pl.'s MSJ, *Bank of*

26    *S.F.*, Dkt. No. 47-1, Exh. C.

27    Then, in March 2018, while his two parallel actions against Robert Half were pending,

28    Rogers interviewed with the Federal Home Loan Bank of San Francisco:

29

> Mr. Rogers was selected for a phone screening interview because he seemed to have the requisite relevant experience and his resume stated that accounts payable was one of his areas of 'expertise.' During the phone screening interview, [the screener] formed concerns regarding Mr. Rogers — namely that he was evasive regarding his work history.

Order Granting MSJ at 2–3, *Bank of S.F.*, Dkt. No. 52 (N.D. Cal. May 26, 2020) (Judge Susan Illston). The team gave Rogers the benefit of the doubt and invited him to interview in person with four people in separate sessions. *See ibid.*; *see also* Email Mar. 20, 2018, *Bank of S.F.*, Dkt. No. 47-1, Exh. D at ECF 13. Rogers again "was not forthcoming regarding his experience" and "raised serious concerns regarding his 'soft skills.'" Order Granting MSJ at 2–3. As one interviewer described,

> I was surprised when [Rogers] seemed unable to describe the accounts payable process he used in his prior work. By the end of the interview, the combination of Mr. Rogers' disengaged body language, his confusing answers about [his current employer,] Centium, Inc., and his inability to describe the accounts payable process, convinced me he was not qualified for the Senior Accounts Payable Specialist position.

*Id.* at 6 n.3 (quoting declaration). As still another interviewer described:

> I also quickly concluded during the interview that Mr. Rogers had been less than forthcoming on his resume about his employment history. When I drilled down about this supposed employment as an 'A/P G/L Accountant' at Centium, Inc., since 2001, Mr. Rogers admitted to me he was the 'founder' and 'only employee' of Centium, Inc., . . . . When I inquired further about Centium, Inc., the industry it was in, the type of work it performed, what type of clients it had, etc, Mr. Rogers was unable to provide any clear answers. Mr. Rogers' murky descriptions of his work at Centium, Inc., did, however, suggest he had virtually no accounting experience whatsoever there and, for the past seventeen years, had primarily focused on operations.

*Id.* at 6 n.4 (quoting another declaration). The interviewers were "also struck by how little Mr. Rogers seemed to know about the Bank and how uncurious he was about it," and he "asked almost no questions." *Id.* at 6 n.5. The bank ultimately hired a well-qualified Hispanic woman. *Id.* at 3. Rogers later followed up with the recruiter by email (nits original):

> Katie,
>
> I want to know the current status of the Sr. AP Specialist position I

> applied for over three weeks ago.  I went to the interview  on March 21, 2018,. However, there's been NO communication since this time. There's been no e-mails, no phone calls, no letters, or any other kind of contact. Very concerned.
>
> Brian

Email Apr. 6, 2018, *Bank of S.F.*, Dkt. No. 47-1, Exh. O.  He first received a note that the process was ongoing, Email Apr. 9, 2018, *Bank of S.F.*, Dkt. No. 47-1 at 41, then a form rejection, Email Apr. 11, 2018, *Bank of S.F.*, Dkt. No. 47-1 at 42.  Rogers responded to the rejection the same day:

> Annette -
>
> I'm not in agreement with your decision to select another candidate.
>
> Your decision or staff decision will face an immediate challenge. If the person selected was less qualified than myself, then there's going to be a major challenge. I also believe this decision was made as much two weeks ago. In addition, I had to spend 30 minutes each with individuals that knew nothing about interviewing. That's also an issue and a problem.
>
> There's also issues as to why I was promised another interview and there was no response. Also, [Katie's] failure to respond to me after several e-mails.
>
> Regretfully,
>
> Brian

Email Apr. 11, 2018 at ECF 52, *Bank of S.F.*, Dkt. No. 47-1, Exh. R.  Contradicting the above, Rogers later complained that "each session did not last the 30 minute allotment time."  Compl. ¶ 23.  He also complained that he was given no reason why he was not hired.  *Id.* ¶ 26.

He escalated the issue by writing the Bank's diversity and inclusion department, then filed charges with the United States Equal Employment Opportunity Commission and the California Department of Fair Employment and Housing.  *Id.* ¶¶ 26–28, 52.

Then, in 2019, Rogers brought suit in our district alleging he was not hired by Bank of San Francisco because he is black, and sought $63,000 annually in back salary and other damages.  *See ibid.*  Defendants answered the complaint and moved to declare plaintiff a vexatious litigant.  *Bank of S.F.*, Dkt. Nos. 12, 21.

**B.    THE ORDER ON THE MOTION TO DECLARE ROGERS VEXATIOUS (2019).**

This finally brings us to the second time a judge considered whether Rogers is vexatious, and the first time in federal court. Recall that at this time Rogers was still subject to the state-court prefiling order. This order recounts the decision, then turns to recount the employment cases Rogers filed thereafter.

In November 2019, District Judge Susan Illston decided in a "close case" not to declare Rogers vexatious — but expressly "g[ave] notice that such an order may be necessary in the future." Vex. Order, *Bank of S.F.*, Dkt. No. 29 [2019 WL 6311393, at *6–7] (N.D. Cal. Nov. 25, 2019). Judge Illston evaluated whether all necessary conditions for imposing a prefiling order were satisfied: (1) notice and an opportunity to be heard, (2) a reviewable record of "numerous or abusive" filings, (3) a finding that those filings were "frivolous or harassing," and (4) a finding that any imposed sanction was tailored to the vice. *Id.* at *6 (citing *De Long v. Hennessey*, 912 F.2d 1144 (9th Cir. 1990)).

*As to notice*, Rogers plainly had notice of the motion. Indeed, he responded with a twenty-one page opposition. Opp., *Bank of S.F.*, Dkt. No. 27. He argued that even if he met "California's vex framework" he did not meet the federal framework. *Id.* at 9, 11. He argued that his then-current action against Bank of San Francisco was "potentially meritorious," and promised to produce evidence that the United States Equal Opportunity Commission had "determin[ed] [that] the bank has a pattern or practice of rejecting African American applicants." *Id.* at 10.

*As to a reviewable record of numerous and abusive filings*, Judge Illston pointed to Rogers's "over twenty" lawsuits filed in state and federal courts. *Bank of S.F.*, 2019 WL 6311393, at *6. She furthermore pointed to particular passages that supported why the litigation was also abusive: "Especially concerning are plaintiff's threats to 're-file' cases and accusations of racial animus against judicial officers." *Ibid.* (citing, as examples, the *Tipton* cases and Rogers's accusations against Judge Lewis leading to the *San Diego* cases). The record before Judge Illston was thus readily reviewable.

*As to finding frivolousness or harassment*, Judge Illston emphasized that whether this condition was met was a "close case."  As stated above, Rogers had filed numerous cases, even abusively.  Yet, in Rogers's favor, Judge Illston noted that, notwithstanding the contexts, the early employment discrimination cases had ended in stipulated dismissals (*Bank of America* and *Previo*), and that the most recent employment discrimination case in state court had granted Rogers leave to amend (*Robert Half I*).  (In *Bank of America*, Rogers prompted the stipulated dismissal through a unilateral request; in *Robert Half I*, Rogers did not timely serve an amended complaint, rendering dismissal final as to individual defendants (*supra*).)  Judge Illston also noted that at least two courts had permitted Rogers to proceed *in forma pauperis* even as the statute governing such funding requires the court to dismiss an action if it decides to review the merits and finds them frivolous.  *Id.* at *7 (citing 28 U.S.C. § 1915(e)(2)).

*So, as to the tailoring of any appropriate sanction*, Judge Illston found that the "extreme" remedy of a prefiling requirement was not yet warranted.  A sword already hung over Rogers's head for each case he sought to litigate *in forma pauperis*:  The fee-waiver benefits Rogers enjoyed could be cut and the case dismissed once a court found it not meritorious.  *Id.* at *6–7.

Judge Illston warned that "plaintiff is hereby given notice that [a prefiling] order may be necessary in the future, should plaintiff persist in filing iterations of the same complaint."  *Id.* at *7.

### C.    THE SUBSEQUENT EMPLOYMENT CASES (2019–2023).

Rogers then lost the case he was litigating before Judge Illston and brought three more employment discrimination cases in the next three years.  This order summarizes these to wrap up our discussion of cases related to Judge Illston's order.  (The subsection numbers repeat "vi" and continue from there to help the reader count the cases litigated on these issues.)

### (vi)    Bank of San Francisco *(2018–2020).*

Three months after Judge Illston's order declining to find Rogers vexatious, Rogers sat for a deposition.  The deposition examined Centium in detail.  Recall that Rogers had attested that he was the sole owner and sole employee of Centium, ran it from home, and gave himself "a lot of titles."  Whereas Rogers's job interviewer in *Robert Half* had been unable to find a

website for Centium, several years later the litigators in *Bank of San Francisco* were able to find a website for Centium and ask Rogers about it (which remains online today).[7]  The website showed a corporate headquarters in San Francisco, but Rogers admitted the address was in fact the street address for a location where Rogers "is planning on having" a physical corporate headquarters.  Rogers Feb. 22, 2020 Dep. Tr. 56, 100, 125, 127, *Bank of S.F.*, Dkt. No. 48-1, Exh. 2.  The website showed other offices, too, in Chicago, New York, Denver, and Atlanta — none of which had ever existed.  *Id.* at 127–29.  The business's online website showed that Centium was, among other things, a global provider of intellectual property, cable television programming, and so on, but in truth Rogers "ha[dn]'t gotten to [that] yet."  *Id.* at 116.  His plan was that "when the company gets bigger, you hire people to do those things."  *Id.* at 117.  Instead, Rogers's business purportedly involved "just republish[ing]" financial information about "public companies," and charging others "an annual fee" to access it.  *Id.* 58–59, 64.  While Rogers said he may have received dollar earnings in 2004 or prior, Rogers said thereafter that "I'm not big enough" as a company to pay himself wages or salary.  *See id.* at 71.  Instead, Rogers stated that his only compensation through this company was in the form of "stock" in Centium, which he said he issued to himself as he wished, from one hand to the other, without any formal agreement.  *See id.* at 70–71, 83, 106.

The deposition turned to what this supported about the interviewers' assessments: Rogers was not prepared for the accounting work, and not prepared to work well with others. As for accounting work at Centium, Rogers said he did not provide accounting services to Centium's purported subscribers, but instead did accounting for his own business affairs, such as tracking payables.  Specific payables in 2017 were, to the extent Rogers could recall, two annual checks and one monthly recurring check.  *Id.* at 96–99, 101.  He had "never managed other people as part of the accounts payable process," *id.* at 166, and last had coworkers in

---

[7]  *Compare* Centium Homepage, Allen Decl. ISO Def.'s MSJ, *Bank of S.F.*, Dkt. No. 48-1, Exh. 3 (N.D. Cal. Apr. 17, 2020), *with* CENTIUM (last visited Feb. 13, 2025), www.centium.org/index.htm [https://perma.cc/6MJY-MC2W?type=image].  Its customer-facing service website also remains online today.  *Compare* US Business Reporter Homepage, Allen Decl. ISO Def.'s MSJ, *Bank of S.F.*, Dkt. No. 48-1, Exh. 4 (N.D. Cal. Apr. 17, 2020), *with* US BUSINESS REPORTER (last visited Feb. 13, 2025), www.usbrn.com [https://perma.cc/3RVR-643B].

United States District Court
Northern District of California

"2001, 2002," *id.* at 170–71.  The best people to speak to his abilities were persons who had worked with him in the 1990s, not all of whom Rogers could even recall.  *Id.* at 199–201.

The deposition then retreaded what basis Rogers had for believing he was discriminated against by race.  Much like in the depositions above, Rogers acknowledged that nothing anyone said or did had struck him as overtly racist.  *Id.* at 194–95, 211–12, 222–23, 228.

Recall that Rogers had told Judge Illston that his case was "potentially meritorious" and that he would produce the damning evidence showing as much.  As it turned out, Rogers did not diligently pursue discovery.  One month after discovery had closed, he urgently sought to reopen it.  His motion was denied.  Order, *Bank of S.F.*, Dkt. No. 46.

Next, upon cross motions for summary judgment, Rogers — who had been involved in over twenty matters across more than two decades at this point — failed to file any opposition or reply until after judgment.  *See* Order, *Bank of S.F.*, Dkt. No. 59.  His late-filed, unsworn reply would have tried to pull apart what he said were "pathetic and incompetent argument[s]" and "ignorant comment[s] by defendant's attorney," who "if he wishes to learn business he should go to business school."  "There simply were no lies on Roger's resume."  "Further, if Roger's had his own company, he could not possibly [have] been 'unemployed for decades' as the defendant claims."  And, it was "unavailing, pathetic and ridiculous" to "purport[] that personality is related to communication skill."  Etc.  Pl.'s Reply, *Bank of S.F.*, Dkt. No. 54.

But, as noted, Judge Illston already had entered her order on cross-motions for summary judgment the day prior.  The district court found Rogers did "not offer[] any evidence establishing the Bank's stated reasons for not hiring him [we]re pretextual.  Indeed, the only concrete evidence Mr. Rogers point[ed] to as evidence he was discriminated against [wa]s that he was not hired."  *Bank of S.F.*, Dkt. No. 52 (N.D. Cal. May 26, 2020).

Rogers lost on all issues.  His appeal was dismissed because he failed to file an opening brief.  Order at 1, *Rogers v. Fed. Home Loan Bank of S.F.*, No. 20-16110 (9th Cir. 2020).

1

United States District Court
Northern District of California

(vii)    **City of Dublin** *(2021–2024)*.

Between 2018 and 2021, Rogers claimed to have continued working for Centium, to have

held two new short-term roles, and to have started a new role with no end date (for citations,

see *supra* note 6):

- 2019 (March), Mission Graduates, Accounts Payable[LIIF];

- 2019 (April), Eden Housing, Inc., Accounts Payable[LIIF];

- 2019–2020 (10 months), City of Berkeley, Senior Accountant
  (stated as "May 2019 - "[LIIF]).

The City of Berkeley role had ended in March 2020, when Rogers was furloughed.  Rogers

Sept. 9, 2024 Dep. Tr. 37, *LIIF*, Dkt. No. 70-1, Exh. 1.  As a result, from March 2020 onwards,

Rogers remained solely "self-employed" at "Centium, Inc," making no money.  *Id.* at 151.

Then, in October 2021, Rogers applied for a position as "Management Analyst II" at City

of Dublin.  In December 2021, Dublin told Rogers he had not been selected.  Rogers filed a

race-based discrimination charge with state and federal agencies.  In July 2022, the parties

entered mediation with respect to that charge, wherein Rogers purportedly learned that the

"Management Analyst II" position had never been filled — prompting Rogers to later bring a

state court suit alleging that the posting was fraudulent, as set out next.

One year later, in June 2023 and the month after the vacation of his state-court prefiling

order in May 2023, Rogers filed suit in state court alleging the posting was fraudulent.  *City of

Dublin*, ROA No. 1 (Cal. Super. Ct. Cnty. Alameda filed June 14, 2023).  Defendant filed a

demurrer stating the suit was facially defective, and Rogers filed an amended complaint.  Then

on the state bench, Judge Eumi Lee pointed out that Rogers had failed to provide proof of

service, that defendant's demurrer remained pending, and that his amended complaint had been

filed without leave.  Order, *City of Dublin*, ROA No. 30 (Cal. Super Ct. Cnty. Alameda Jan.

10, 2024).  Rogers then voluntarily dismissed the action with prejudice.  *City of Dublin*, ROA

No. 32.

###### (viii)    Low Income Investment Fund *(2022–2024).*

Recall Rogers lost his job at City of Berkeley in 2020.  Between 2021 and 2022, Rogers did not gain employment.  Nonetheless, through at least the end of 2022, Rogers listed on his resume his City of Berkeley role as if it had not ended: "*City of Berkeley (May 2019 – ), (City Government) Senior Accountant*."  And, he listed his "self-employment," that is, unemployment, as if it were an executive role at a going concern with other employees: "*Centium, Inc.  (Jan 2002 – Current), (Internet)  Senior Manager / Financial Officer*."  Pl.'s Decl. ISO Opp. MSJ, *LIIF*, Dkt. No. 74, Exh. B.

What happened next is already extensively described by the undersigned's summary judgment order (*see* Dkt. No. 90), and parallels what happened in *Bank of America*, *Robert Half*, and *Bank of San Francisco*:

In August 2022, Rogers interviewed for a staff accounting role at Low Income Investment Fund.  Rogers made it through screening, raising no flags.  In October 2022, he interviewed again.  His potential boss and colleagues found Rogers's work history "a little odd" and through questioning came to believe he in fact lacked the skills and experience the job demanded (*id.* at 3).  The employer ultimately hired a well-qualified woman who was not white (*id.* at 5).  Rogers escalated his concerns by emailing human resources to allege that he was not hired because he was black, filed charges with federal and state equal employment agencies to obtain a right to sue, and brought suit in federal court (Dkt. No. 1).

Ultimately, as in other cases, Rogers failed to diligently pursue discovery and sought an extension, which was denied (*see* Dkt. No. 90 at 12 (comparing with *Bank of San Francisco*)).

Unlike in past matters, however, or at least unlike what was visible to the public in past matters, Rogers diligently pursued something else instead:  information about Low Income Investment Fund's employment insurance policy (*see id.* at 12–13).  While knowing he lacked support for his substantive claims (as later became clear from his deposition), Rogers threatened to make defamatory statements about his opponents to cut off their donations if they did not pay him a settlement amount covered by that policy (*ibid.*).  He emailed at least one of the non-profit's donors making statements he knew to be false (*ibid.*).  These communications

1    dovetailed with dates when a litigant seeking to resolve a legitimate dispute in court would

2    have been focused on doing just that, such as deposition and discovery deadlines (*see ibid.*).

3        Defendants moved for summary judgment.  As in *Robert Half*, the allegations against

4    individual employees were non-cognizable (*id.* at 15).  And, as in *Bank of San Francisco*,

5    "Rogers fail[ed] to point to any evidence suggesting [pretext], let alone 'specific and

6    substantial' evidence" required by law (*id.* at 19).  Finally, as in many of his past matters,

7    including the car shop *Tipton* cases and the car tow *A-to-Z* cases, Rogers responded to his

8    defeat by filing onto the docket a statement accusing the judicial officer of incompetence and

9    racism (*see* Dkt. No. 95).  His appeal pends.

10                        ***(ix)*    City of San Francisco *(2022–Present)*.**

11        In December 2022, or one month after his second interview in *Low Income Investment*

12    *Fund*, Rogers applied for a Senior Account Clerk position at the San Francisco Public Utility

13    Commission.  Compl. ¶ 17, *City of S.F.*, Dkt. No. 1 (N.D. Cal. filed Sept. 28, 2023).

14        In January 2023, he interviewed.  "Between the three interviewers, they only asked about

15    6 questions.  However, the questions were ridiculously structured into compound questions that

16    were essentially four questions in one.  These so-called interviewers were unqualified and

17    unprepared to conduct the interview."  Compl. ¶ 20.

18        Rogers was rejected without explanation.

19            The only reason that Mr. Rogers was <u>NOT</u> hired for the position is
             strictly because of his race.  SFPUC decision not to hire Mr.
20            Rogers was ridiculous, insidious, obnoxious, and NOT factual.
             [The interviewer] has no formal education, training, or and other
21            type of credible experience which would suggest that she was
             qualified to conduct an interview.  [She] gave no reason for her
22            decision  and the panel not to hire Mr. Rogers and kept their reason
             confidential and had no other contact with Plaintiff after the
23            interview.

24    Compl. ¶¶ 28–31.  The seemingly specific accusations — including about unqualified

25    interviewers — cribbed the *Low Income Investment Fund* complaint (*cf.* Amd. Compl. ¶ 32).

26        In March 2023, he contacted an internal investigation unit at the prospective employer,

27    but "it's been six months and they never even started on the investigation.  The EEO programs

28

United States District Court
Northern District of California

1    manager was also contacted at the City.  Her name is [irrelevant here].  She continues to make

2    ridiculous excuses as to why the City has not completed its investigation." *Id.* ¶ 33.

3        In June 2023, Rogers filed a complaint with the United States Equal Employment

4    Opportunity Commission.  *Id.* ¶ 32.

5        And, in September 2023, he filed suit in federal court.  A motion to dismiss limited to

6    two issues was granted as to the emotional distress claim (also present in *LIIF*) but denied as

7    categorically premature to a question of punitive damages.  Order, *City of S.F.*, Dkt. No. 27

8    (N.D. Cal. Feb. 23, 2024) (Judge Joseph Spero).  Judge Spero requested that plaintiff seek a

9    lawyer, *ibid.*, and later he asked that Rogers maintain a list of the lawyers whom he had sought

10   to retain, Minutes, *City of S.F.*, Dkt. No. 49 (N.D. Cal. Oct. 16, 2024).  Rogers later filed a

11   letter that began as follows:

12       Dear Judge Spero:

13       I'm still having a very difficult time finding an attorney for this
         case.  I know you wanted me to find someone who would take the
14       case on a contingency basis. But they are all rejecting the case
         even on a contingency basis.  I will keep trying but it's becoming
15       very frustrating and time-consuming.

16   Letter of Dec. 17, 2024, *City of S.F.*, Dkt. No. 50 (N.D. Cal. Dec. 18, 2024).

17       Most recently, Judge Spero "asked Defendant to file a statement explaining their

18   settlement position and why they believe Plaintiff does not have a case so he can understand

19   their reasoning."  Minutes, *City of S.F.*, Dkt. No. 55 (N.D. Cal. Jan. 15, 2025).

20       The case pends.

21       **4.    THE IMMEDIATE PROCEDURE.**

22       Thus, we turn to the question at hand.  After Rogers lost his case before the undersigned,

23   the Court retained jurisdiction to address whether to deem Rogers vexatious (Dkt. No. 90).

24       In December 2024, the Court issued an order to show cause why Rogers should not be

25   subjected to a prefiling order (Dkt. No. 94).  The same day, plaintiff responded with a letter

26   critiquing the undersigned, concluding "Your nothing but a slave in my opinion" (Dkt. No. 95).

27       On January 30, 2025, the appointed hearing date, Rogers did not appear.  The district

28   court called the case three times over the course of the morning's calendar, and asked opposing

counsel and the courtroom deputy if they had heard from Rogers. They had not. Those who did appear advocated that Rogers be declared vexatious. From the bench, the Court stated that Rogers would be declared vexatious, with the order to follow in writing. Jan. 30, 2025 Tr.

## ANALYSIS

When a litigant's filings are frivolous and harassing, districts courts have the inherent power under 28 U.S.C. § 1651(a) to declare the litigant vexatious and to subject his future complaints to an initial review before filing. *See Molski*, 500 F.3d at 1057. Our court of appeals has cautioned that "such pre-filing orders are an extreme remedy that should rarely be used" because of the danger of "tread[ing] on a litigant's due process right of access to the courts." *Ibid.* Nevertheless, such orders are sometimes appropriate because "[f]lagrant abuse of the judicial process . . . enables one person to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants." *De Long*, 912 F.2d at 1148. The district court appropriately exercises its discretion to impose a prefiling order upon: (1) notice and an opportunity to be heard, (2) a reviewable record of the filings that informed the decision, (3) a substantive finding that those filings were "frivolous or harassing," *and* (4) a finding that any imposed sanction is tailored to the vice. *Ibid.*; *Molski*, 500 F.3d at 1057.

### 1.    NOTICE?

This order finds that Rogers "was given notice and an opportunity to be heard before the district court entered the pre-filing order." *Molski*, 500 F.3d at 1058. Recall an order issued asking Rogers to show cause why he should not be declared vexatious (Dkt. No. 94). It set a briefing and hearing schedule. Rogers responded the same day (Dkt. No. 95). His post-script stated: "Now your going to retaliate after this letter by designating me as a vexatious litigant. Ha, Ha, Ha. Who cares !!!" (*ibid.*). Ultimately, Rogers did not appear for his hearing. But his actions again show he paid attention. Within three hours of the hearing's conclusion, Rogers entered a purported appeal (though no order had issued). Regardless, "[t]he opportunity to brief the issue [itself] fully satisfie[d] due process requirements." *Id.* at 1059 (quoting *Pac. Harbor Cap., Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000)).

As was also true before Judge Illston, Rogers had notice here.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.    REVIEWABLE RECORD?

This order finds that Rogers has produced a sufficient record of litigation, as collected in this order, to make a reviewable determination.  *See ibid.* (adequacy met where district court listed all cases as well as "outlin[ed] and discuss[ed] many of them").  Rogers has filed or attempted to file over twenty cases.  All those known to the undersigned are listed above (*see* Statement § 1).  A dozen are outlined and discussed above (*id.* §§ 2–3).  All have been reviewed by the district court.  This order also incorporates by reference the record set out in the summary judgment and sanctions order in *Low Income Investment Fund* (Dkt. No. 90).

As is even more true after Judge Illston's order, Rogers has produced a rich record.

### 3.    FINDINGS OF FRIVOLOUSNESS OR HARASSMENT?

Moving "to the heart of the vexatious litigant analysis," this order next finds Rogers's filings have been "frivolous or harassing" — and indeed both.  *See Molski*, 500 F.3d at 1059 (quoting *De Long*, 912 F.2d at 1148).  Judge Illston found this factor to be "close."  No longer.

#### A.    FRIVOLOUSNESS?

"[T]he district court must 'look at both the number and content of the filings as indicia of the frivolousness of the litigant's claims.'"  *Ibid.* (internal quotations omitted) (quoting *De Long*, 912 F.2d at 1148).

##### (i)    Number?

This order finds Rogers has filed an inordinate number of complaints.  *Ringgold-Lockhart v. Cnty. of L.A.*, 761 F.3d 1057, 1064 (9th Cir. 2014) ("inordinate"); *Moy v. United States*, 906 F.2d 467, 470 (9th Cir. 1990) ("numerous").[8]  His filings are numerous three ways.

*First*, in total number:  Rogers has filed or attempted to file over twenty matters, as Judge Illston pointed out and the timeline above reviews (Statement § 1).  This is a large number for any person who, like Rogers, lives an otherwise typical life (repairing his car, changing apartments, and so on).  But this order does not ding Rogers just for being litigious.

---

[8]  Recall "inordinate" means "not regulated, controlled, or restrained"; "not kept within orderly limits, immoderate, intemperate, excessive."  OXFORD ENGLISH DICTIONARY (3d ed. June 2024), https://doi.org/10.1093/OED/1958455163.

*Second*, in number per defendant: Rogers has "re-filed" matters more than once against the same defendants regarding the same incidents, again a behavior Judge Illston found "[e]specially concerning." When Rogers has received unfavorable results (or has been on the precipice of them), he has re-filed his case. For example, when Rogers's state cases against the car shop did not reach the result he wanted in *Tipton I* and *II*, he filed a federal case against the county and judge overseeing *Tipton II*, and when that was dismissed with prejudice in *San Diego I* he "re-filed" the same case in *San Diego II*, saying "Plaintiff will <u>CONTINUOUSLY</u> file this case until there's a satisfactory resolution. !" (*supra* Statement § 2). The employment cases against *Robert Half* show the same (*id.* § 3.A.iv–v). Indeed, such behavior appears throughout his cases (*id.* § 1 (listing repetitive filings in the *AMC*, *A-to-Z*, and other cases)).

*Third*, in number per type of claim: Rogers has filed "iterations of the same complaint" against *different* defendants, a behavior for which Judge Illston said a prefiling "order may be necessary in the future," and which has become more pronounced since. In contrast to instances where Rogers has "re-filed" complaints against the same defendants, in these instances Rogers has "re-filed" in essence the same claims against different defendants. As one example, after failing to prevail in all eight *A-to-Z* cases concerning one instance of his car being towed, Rogers brought in *John Boys* a new case alleging another instance of his car being towed three days after the *A-to-Z* towing — this case also being decided against Rogers (*supra* Statement § 1 (citing and summarizing)). As another example, take the employment discrimination claims Rogers brought against different employers in *Bank of America*, *Robert Half I–II*, *Bank of San Francisco*, and *Low Income Investment Fund*, each of whom had decided not to hire Rogers after uncovering that he did not have the skills or experience commensurate with his falsified resume (*see* Statement §§ 3.A, 3.C).

Our court of appeals has underscored this third kind of numerosity before, and explained how — anticipating our discussion of the next factor, content — the sheer number of complaints on one topic can undercut or countervail otherwise credible content that might exist in those complaints (though here the content is incredible for other reasons, too). In *Molski*, a

person who used a wheelchair brought dozens of complaints against different defendants, each alleging the same sorts of injuries under the ADA. Our court of appeals reasoned:

> Because many of the violations Molski challenged were similar, it would have been reasonable for Molski's complaints to contain similar allegations of barriers to entry, inadequate signage, and so on. However, it is very unlikely that Molski suffered the same injuries, often multiple times in one day, performing the same activities — transferring himself from his wheelchair to the toilet or negotiating accessibility obstacles. Common sense dictates that Molski would have figured out some way to avoid repetitive injury-causing activity; even a young child who touches a hot stove quickly learns to avoid pain by not repeating the conduct. The district court's conclusion that Molski "plainly lied" in making his injury allegations was not clearly erroneous.

500 F.3d at 1059. Here, the facts are different, but the point is the same or stronger. Take the employment cases. Since *Bank of America* in 1999, in every employment case with a developed record (all but *Previo*, *City of Dublin*, and the pending *City of San Francisco*), it is plain that Rogers lied on his resume, got an interview, got found out as not having the skills his resume had represented, was not hired, brought a claim for race discrimination while knowing the non-pretextual reason he was not hired, got found out as not having the evidence his complaint had represented, and either unilaterally sought dismissal (*Bank of America* (prompting a joint stipulation)) or lost with prejudice (*Robert Half I*, *Robert Half II*, *Bank of San Francisco*, *Low Income Investment Fund*) — then repeated the process with a new employer (despite now knowing even better than before that he had no basis for bringing claims) (*see* Statement §§ 3.A, 3.C). In short, Rogers has been touching the stove for 25 years. His filings are "immoderate, intemperate, excessive" — such that even their sheer number calls into question their content, which is meritless for its own reasons as described next.

### (ii)    Meritless or False?

This order finds Rogers has filed not merely numerous complaints, but meritless ones:

> Frivolous litigation is not limited to cases in which a legal claim is entirely without merit. It is [even] frivolous for a claimant who has some measure of a legitimate claim to make false factual assertions. Just as bringing a completely baseless claim is frivolous, so too a person with a measured legitimate claim may cross the line into frivolous litigation by asserting facts that are grossly exaggerated or totally false.

United States District Court
Northern District of California

*Molski*, 500 F.3d at 1060–61.  In *Molski*, the repeat plaintiff was deemed vexatious for bringing ADA claims despite the possibility that some or even all defendants might have somewhere failed to comply with the ADA.  *Ibid.*  Here, Rogers no longer presents even the "close case" he presented to Judge Illston.  With the benefit of Judge Illston's later summary judgment order against Rogers, and with Rogers's subsequent filings showcasing the same concerning behaviors that Judge Illston identified, it is plain Rogers has crossed the line "between aggressive advocacy of legitimate claims and the frivolous assertion of false allegations."  *See ibid.*  Rogers's filings are rooted in falsity in at least three ways.

### (a)      *Falsities Leading to the Complaints.*

Many of Rogers's complaints concerned situations where Rogers was caught in a lie and faced a consequence — with that consequence becoming the basis for his legal complaint. These pre-complaint falsities support finding his claims frivolous because they always undercut Rogers's credibility, often undercut the basis for liability, and — though not part of this order's conclusion — could limit recoveries even if Rogers could show liability.[9]

Take the *A-to-Z* car-towing cases as one example:  Rogers used fake license plates, so his car was towed, prompting his complaint.  As Rogers nonchalantly alleged:

> Plaintiff had alternative license plates on the vehicle since DMV refused to enter new license plates in the vehicle.  The alternative license plate numbers had expired tags but the alternative license plates were never assigned to anybody in California.  As a result, Defendant Chambers wrote Plaintiff a citation for 'false tags' under California vehicle code 4462.5  Subsequently, Chambers authorized and delegated a tow company . . . .

Compl. ¶¶ 11–12, *A-to-Z I*.  In later iterations of the complaint, Rogers dropped this fact, while newly alleging constitutional torts.  *E.g.*, Compl., *A-to-Z VIII*.  Ultimately, Rogers's serial filings related to this August 6 or 7, 2015 towing stopped only after Rogers accepted his claims

---

[9]  A person who faced discriminatory hiring under Title VII might see little or no remedy if they lied on their resume and were unqualified, even if such fraud were discovered later.  *Cf. Miranda v. Costco Wholesale Corp.*, No. 95-1076-JO, 1996 WL 571185, at \*8 n.11 (D. Or. May 7, 1996) (Judge Robert Jones), *aff'd on alt. grounds*, 168 F.3d 500 (9th Cir. 1999) (mem.); *see also Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 634 (1995); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 760 (9th Cir. 1996).  *But cf. Hyatt v. Northrop Corp.*, 80 F.3d 142 (9th Cir. 1996) (applying doctrine with sensitivity to facts, given contrasting results in *Camp* (yes barred) and *Cooper v. Rykoff-Sexton, Inc.*, 24 Cal. App. 4th 614 (1994) (not barred)).

1    had become time-barred (this in federal court, *after* related claims had been dismissed with

2    prejudice in state court).  (The essentially identical complaint in *John Boys* alleged a separate

3    August 8 or 9, 2015 tow, left out the days-earlier one, and was also by that point time-barred.)

4          Take the employment-discrimination cases as another example, which were introduced

5    above as to numerosity:  For years, Rogers has submitted resumes with false work histories to

6    employers, those employers have discovered Rogers cannot speak about those experiences in

7    stride, and they have declined to hire Rogers as a result — prompting him to bring suits (*see*

8    Statement § 3).  This occurred in 1999, in *Bank of America*, when Rogers represented that he

9    had worked about two years in a highly relevant role at Kaufman & Broad Mortgage Co. —

10   when in fact he had worked there about two months (*see* Statement § 3.A.ii)  And, this

11   occurred in 2022, in *Low Income Investment Fund*, when Rogers represented that he had

12   worked about three years in a moderately relevant role at City of Berkeley — when in fact he

13   had worked there about ten months (*see* Statement § 3.C.viii; Dkt. No. 90).  In the years

14   between, in *Robert Half I–II*, in *Bank of San Francisco*, and again in *Low Income Investment

15   Fund*, Rogers claimed to have held a variety of senior roles with internet company Centium —

16   when in fact he was its sole owner, he was its sole employee, he had fabricated a website

17   touting nonexistent business lines and fake office locations, he had not done specific work

18   relevant to his applications that his resume said he had performed, and he had not received any

19   compensation from the business since 2004 except undocumented transfers from one hand to

20   the other of its "stock" he already solely owned (*see* Statement § 3.C.vi (re *Bank of S.F.*); *see

21   also id.* § 3.A.iv; *id.* § 3.C.viii; Dkt. No. 90).  Again, these pre-complaint falsities undercut

22   Rogers's credibility in general while also undercutting his specific contentions that he was

23   qualified for the roles and that there was no non-pretextual basis for not hiring him.

24                    *(b)        Falsities in the Complaints.*

25         As this suggests, Rogers's complaints have been rooted in falsity also because Rogers has

26   lacked foundation for core claims — let alone for "peripheral" claims he has added only to

27   drop once challenged.  Many of his complaints contained outright falsities.  Recall that "[i]t is

28   a question of degree where the line falls between aggressive advocacy of legitimate claims and

1    the frivolous assertion of false allegations." *Molski*, 500 F.3d at 1060–61.  Rogers's recent

2    filings have confirmed the pattern, clarifying what also occurred in past complaints.

3        Take the banking discrimination case as one example.  In *Zions Bancorporation*, Rogers

4    alleged that the bank refused to deposit checks because he was black.  Compl. at 3, 7, Dkt.

5    No. 5.  The district court dismissed this claim with prejudice.  "Plaintiff's claim that

6    Defendant[s] failed (or refused) to deposit his checks into his account for immediate access of

7    the funds 'based purely on Plaintiff's race and color[]' [wa]s not supported by material facts."

8    Order at 3, Dkt. No. 14 (Judge Roger Hunt).  "The fact that Plaintiff is African-American is not

9    evidence that every action or decision made by others is predicated on that fact."  *Id.* at 6.  As

10   it turned out, it was not even true that the bank had refused to deposit checks.  Rather, when

11   told of the deposit policy, Rogers deposited some checks and decided against depositing

12   others.  *Id.* at 3.  Other claims were even more frivolous.  Plaintiff added employment

13   discrimination claims against the bank, but the bank "[wa]s not his employer, nor ha[d]

14   [Rogers] ever sought employment" there.  *Id.* at 4.  His allegation of intentional infliction of

15   emotional distress was also wholly unsupported.  *Id.* at 8.  The complaint was frivolous.

16       Take the smog-check case as another example.  In *Caballero*, Rogers alleged that the

17   state refused to waive a smog-check requirement for his old car and discriminated against him

18   on the basis of his economic status.  But Rogers

19           fail[ed] to allege any facts to support that conclusory assertion.
20           Indeed, the facts alleged indicate that [California] has created a fee
             waiver program to *assist* low income individuals in meeting the
21           smog check requirement, which is inconsistent with Plaintiff's
             allegation that Defendant discriminated against him based on his
22           low income status.  That Plaintiff was deemed ineligible for the fee
             waiver program does not show Defendants acted with an intent to
23           discriminate against Plaintiff because of his membership in a
             protected class.

24   Order at 6, *Caballero*, Dkt. No. 22 (S.D. Cal. Oct. 21, 2015) (Judge Dana Sabraw).  Rogers's

25   conclusory assertions ensnared individuals.  Opposing the motion to dismiss, Rogers stated

26   elliptically that these defendants "had personal involvement with [him] through telephone

27   conversations and electronic mail," but that Rogers was "not at liberty to discuss the nature of

28   those e-mail documents in an original complaint."  *Id.* at 4 (quoting Rogers).  Because "that is

United States District Court
Northern District of California

1    where the allegations must be for the Court to consider them" on a motion to dismiss, the

2    district court dismissed the claims.  *Ibid.*  This complaint, too, was frivolous.

3        Take the employment discrimination cases as another example.  In all employment cases

4    with a developed record, Rogers ultimately acknowledged that no specific fact about the hiring

5    process struck him as biased at the time (or in most cases since) — except that he was not hired

6    (*supra* Statement § 3).[10]  Nonetheless, his immediate response to learning he was not hired was

7    almost always to threaten legal action alleging discrimination.[11]  Once, Rogers even admitted

8    outright that he did *not* believe he was discriminated against but filed a discrimination charge

9    anyways with the United States Equal Employment Opportunity Commission because "I

10   should have been given more opportunity."  *See* Rogers July 28, 2000 Dep. Tr. 13–14, *Bank of*

11   *Am.*, Dkt. No. 50, Exh. H.  None of his charges resulted in a determination in his favor (*see,*

12   *e.g.*, Dkt. No. 90 at 8–9).  His ensuing court complaints doubled-down on false statements

13   submitted in Rogers's job applications — touting, for instance, ongoing professional education

14   in accounting that he never received.[12]  Some of Rogers's complaints in these race-based

15   discrimination cases also asserted sex-based discrimination and infliction of emotional distress

16   (*e.g.*, Dkt. No. 90 at 9–10).  When defendants poked at these claims, they went poof (*ibid.*).

17       The case before the undersigned is one more instance of Rogers "cross[ing] the line into

18   frivolous litigation by asserting facts that are grossly exaggerated or totally false."  *Molski*, 500

19   F.3d at 1061.  Rogers later acknowledged that he lacked specific factual support for many of

20   his contentions, such as that defendant organization had rejected all black applicants in a given

21   department.  And yet, Rogers's *amended* complaint offered an authoritative, all-knowing

22   takedown of defendant interviewers, defendant organization, and American society:

23

24   [10]   *See* Rogers July 28, 2000 Dep. Tr. 13–14, *Bank of Am.*, Dkt. No. 50, Exh. H (re job application
     to Santa Clara County); Pl.'s Rebuttal of Joint Statement of Undisputed Facts ¶ 18, *Bank of Am.*,
25   Dkt. No. 56, Attach. ("At the time of the interview, it did not seem that racial bias was an issue.");
     Op. at 4–5, *Robert Half I App.*; *Bank of S.F.*, Dkt. No. 52; *LIIF*, Dkt. No. 90 at 19.
26   [11]   *See* Email Dec. 9, 2015 at 11:50 a.m., *in* Pl.'s Evid. Opp. to Def.'s MSJ, *Robert Half I*, ROA
     No. 51, Exh. G; Letter of Apr. 17, 2018, *in* Def.'s MSJ, *Bank of S.F.*, Dkt. No. 48-3 at 57, Exh. M;
27   *LIIF*, Dkt. No. 90 at 5, 7–8 & n.3.
     [12]   *Compare* Compl. ¶ 14, *Bank of S.F.*, Dkt. No. 1 (ongoing education), *with* Rogers Feb. 22,
28   2020 Dep. Tr. 30–31, *Bank of S.F.*, Dkt. No. 48-1, Exh. 2 (no ongoing education).

United States District Court
Northern District of California

This case is a clear example when you have two white males interviewing a black person. That black person will be rejected every time even if the black person is more qualified than his/her white counterpart. [Note that a Hispanic woman also interviewed and assessed Rogers, and that Rogers later admitted that nothing about the interviews struck him as racially biased at the time.]

American society is predominantly based on what race YOU are. This society does not based decisions on merit factors such education, skill, experience, know-how, intelligence, or any other material factor. Decisions in U.S. society are purely based on what race you are. What other basis in life would the selection be based on if the criteria was not race in this immediate case? There is none. . . . [Note that on summary judgment Rogers left entirely unrebutted the alternative explanation that he was not hired for his "spotty" work record (Dkt. No. 90 at 19).]

LIIF <u>DOES NOT</u> practice what they preach on their web site. Their message on their web site is nothing but a cover up (or masquerading) in an attempt to hide their true white racist feelings. . . . Though LIIF claims to have anti-racist values. This is not true. In fact, they project a racist ideology by failing to actually hire blacks for positions in their Accounting/Finance department when they are more qualified than their non-black applicants and employees[.] This conduct is simply a 'racial conspiracy' to deny African American's the opportunity to work in their organization. LIIF is simply masquerading a systemic problem in society in which they are continuing to participate. Specifically, discriminating against black people in particular. . . .

The fact is every time a black applicant applies for a position within their accounting and finance department that are rejected for employment at LIIF. [Note that Rogers later acknowledged he lacked foundation for this and other statements herein.]

All persons making hiring decisions are all white male individuals which suggests a form of race-based discrimination. . . .

Mr. Rogers was NOT ONLY highly qualified for the position that he applied for. But he actually has better credentials than the interviewer Mr. Baskin as the Accounting Manager. [Note that Baskin held a credential in accounting (as did the non-white woman hired for the role), whereas Rogers did not (*id.* at 20).]

The only reason that Mr. Rogers was <u>NOT</u> hired for the position is strictly because of his race only.

The reasoning of Mr. Baskin [for not hiring Rogers] was ridiculous, insidious, obnoxious, and NOT factual.

Mr. Baskin was unprepared and unqualified to conduct interview of candidates. Mr. Baskin has no formal education, training, or and other type of credible experience which would suggest that he was qualified to conduct an interview.(of any candidate!).

Mr. Baskin believes that he is superior because he happens to be a

> white male.  Mr. Baskin has this white male "superiority complex" as though he's privileged in society to conducted himself in any manner he wishes simply because his skin is white.
>
> LIIF gives one reason is  "And other things".  The reason "And other things " as stated on October 12, 2022 email by [Ms.] Baptiste is <u>NOT A legitimate</u> reason under federal law.  Instead, this is code word for " we did not hire you because you are black." [Note that Rogers composed his emails and complaint without knowing Baptiste's race (*see id.* at 7 n.3).]
>
> The only reason Mr. Baskin even obtained his position as a controller is strictly because his skin is white.  Mr. Baskin is neither qualified or acceptable to be an Accounting Manager at LIIF or any other organization.  He has extremely poor judgment, poor communication skills, and extremely poor interpersonal skills.  However, he still obtained the position as an Accounting Manager at LIIF simply because his skin is white. . . . .
>
> Mr. Baskin is nothing more than a "scrub."

(Amd. Compl. ¶¶ 17–40 (paragraph numbering omitted)).  And on and on and on.  At bottom, all of Rogers's allegations of racism turn on a tautology:  Rogers alleges that "[t]he only reason that Mr. Rogers was <u>NOT</u> hired for the position is strictly because of his race only," *e.g.*, Amd. Compl. ¶ 32, *LIIF*, Dkt. No. 48; Compl. ¶¶ 28–31, *City of S.F.* (cribbing same), but courts ultimately find that "the only concrete evidence Mr. Rogers points to as evidence he was discriminated against is that he was not hired," *e.g.*, Order Granting MSJ, *Bank of S.F.*, Dkt. No. 52; Order Granting MSJ at 17, 19–20, *LIIF*, Dkt. No. 90.

In over 25 years of litigation, Rogers has never prevailed on a claim of discrimination. Indeed, with one exception, he has not prevailed on *any* claim.  And, that exception proves the rule:  Rogers re-filed that fully resolved case for a third time to seek the larger sum he still believed he deserved, while starting a separate series of cases accusing the judge who ruled in his favor of racism (*supra* Statement §§ 2.A–B (re *Tipton I–III* and *San Diego I–II*)).

"[W]here[ever] the line falls between aggressive advocacy of legitimate claims and the frivolous assertion of false allegations," *Molski*, 500 F.3d at 1061, Rogers has crossed it.

### (c) Falsities in Prosecuting the Complaints.

Rogers's complaints have been frivolous for a third reason, too:  He has frustrated legitimate efforts to defend his claims by raising frivolous objections to requests for

information (and responding with false information) while failing to prosecute his claims (and instead seeking settlement in bad faith).

Rogers has objected that "Everything is a secret." Rogers Feb. 22, 2020 Dep. Tr. 30, *Bank of S.F.*, Dkt. No. 48-1, Exh. 2. Take the employment cases as one example. Among his many objections, Rogers has refused to answer questions about (sometimes until specifically ordered deposed and asked repeatedly under oath):

- his academic credentials, *ibid.*;

- the name of his "last employer" — only to later provide a name, "Sypherion Corporation," for which no public records existed (a name which has not appeared on any of Rogers's court-filed resumes in over twenty years of litigation), Letter Sept. 29, 2000, *in* Def.'s Mot. Compel, *Bank of Am.*, Dkt. No. 27, Exh. F;

- what his job interviewers said to him that seemed racist, if anything, Rogers July 28, 2000 Dep. Tr. 94–95, *Bank of Am.*, Dkt. No. 50, Exh. H;

- any basis for damages or efforts to mitigate his damages, including any salary or wages he has earned, Letter Aug. 11, 2000 (Requests 16–18), *in* Def.'s Mot. Compel, *Bank of Am.*, Dkt. No. 27, Exh. D;

And so on. When Rogers finally has answered truthfully, the falsity of his underlying conduct and of his complaint has become clear (*see* Statement § 3 (detailing examples)). But busting through these frivolous objections has cost defense counsel and public courts dearly.

While thus stalling defendants, Rogers has declined to prosecute his own claims. Among the numerous examples, Rogers has:

- failed to appear to show cause why he failed to file a prefiling request as required by court order in California, *A-to-Z I*, ROA No. 28 [SI 65];

- failed to pursue cases after his *in forma pauperis* status was denied, *e.g.*, *AMC I*, Dkt. No. 3 [SI 13];

- failed to amend after an initial dismissal with leave to amend, *e.g.*, *AMC II*, Dkt. Nos. 4, 6 [SI 18, 19], *Robert Half I* (as regards employees, as cited in Statement § 1);

- failed to amend with anything but a few superficial edits, *e.g.*, *A-to-Z VIII*, Dkt. No. 6 [SI 73]; *Caballero*, Dkt. No. 34 [SI 61];

- failed to meet and confer on a discovery dispute he raised, failed to appear for the discovery dispute he raised, and then failed even by one week later to read any of defendants' responses to his request

(*see* Dkt. No. 59; Dkt. No. 61);

- failed to agree to sit for his own deposition until specifically court-ordered (*see* Dkt. No. 59);

- failed to produce compelled evidence and faced terminating sanctions as a result, *e.g.*, *Tipton I*, ROA Nos. 36, 41 [SI 31, 32];

- failed to pursue his own discovery diligently, and so had a motion to extend discovery denied (Dkt. No. 66; Dkt. No. 90 at 12), *e.g.*, *Bank of S.F.*, Dkt. No. 46;

- voluntarily dismissed his claims after defendants threatened sanctions, *Tipton III*, ROA No. 75 [SI 42] (summarizing);

- refused to appear to argue a pending summary judgment motion and unilaterally requested dismissal, *Bank of Am.*, Dkt. No. 63;

- failed to oppose a motion or report recommending dismissal, *AMC III*, Dkt. Nos. 2, 4 [SI 22, 23]; *John Boys*, Dkt. No. 35;

- failed to appear on an order to show cause (Dkt. No. 99);

And so on. This order finds that Rogers's tendency to let complaints fizzle out is a corollary of his tendency to re-file complaints: Both reflect a pattern of threatening others with endless, meritless annoyances until he gets what he wants.

In short, Rogers's complaints are numerous and meritless. Compounding the untruths that Rogers has told others in life (with false resumes, fake license plates, and so on), Rogers has brought foundationless legal claims — then frustrated the truth's discovery by frivolously objecting to basic questions, providing false answers, and failing to prosecute. He has pursued instead settlement in bad faith, including through extortionate conduct (*see, e.g.*, Dkt. No. 90).

## B.    HARASSMENT?

Rogers's litigation has also been not only frivolous, but harassing, as that last point suggests. This provides a separate basis for finding Rogers vexatious. *Molski*, 500 F.3d at 1059–60. The evidence of Rogers's harassment to defendants, defense counsel, and courts is overwhelming — as Judge Illston emphasized while warning that if the misconduct continued a prefiling order would soon be merited. Again take the case heard before the undersigned:

*Before bringing his complaint*, Rogers wrote a series of harassing, extortionate emails to the human resource officer, accusing her and her organization of racism (*see* Dkt. No. 90 at 7 & n.3). Just two hours after he learned he was not hired, he threatened her livelihood:

> I think YOUR donors should know about your white racist conduct
> as well. Let's see whether you still have an organization (or a job)
> after revealing this to YOUR donors. I will see you in U.S.
> Federal District Court next year.

(*Ibid.* (quoting email)).

*In his complaint*, Rogers used the occasion to blast her again, as well as to blast his interviewer as a "scrub" with "poor judgment" (*supra*). Rogers accused his would-be employer as "masquerading" as anti-racist (*ibid.*). He then cited his baseless complaint in emails to donors to press for a settlement (*see* Dkt. No. 90 at 10–11 (excerpting email)).

*While his matter was pending*, Rogers continued to harass defendants with extortionate threats (*see ibid.*; Dkt. No. 60) — and began harassing opposing counsel, too. When one lawyer rotated off the case, Rogers asserted baselessly that she was "terminated from her employment [at the law firm] due to her level of incompetence," then turned that into a self-contradictory basis for settlement by stating that "LIIF has nobody worthy to represent you in court in two weeks (Dkt. No. 90 at 13–14 (quoting email)).

*After his suit*, Rogers took to berating the undersigned (*see* Dkt. No. 95).

These were well-worn patterns (*supra*). Pick up any one of Rogers's case files, read it cover to cover, and you will find Rogers lashing out at those he meets in his daily life, at counsel's table, and on the bench. He does not simply encounter a tow-truck driver, but a "fat, nasty, disgusting, lazy Mexican." *A-to-Z II*, ROA No. 1. He does not encounter defense counsel, but "an incompetent, inexperienced, and highly unprofessional attorney." Pl.'s Letter of Jan. 22, 2001, *Bank of Am.*, Dkt. No. 43 (filed Feb. 1, 2001) (addressing one lawyer in case). He does not encounter opposing arguments, but "'read[s] between the lines' [to learn that opposing counsel] is really implying that racism and discrimination are frivolous notions by minority people," which "is typical since it's coming from the mouth of a white person" who is "dangerous," "may need some form of counseling," and "this woman is crazy and should not

United States District Court
Northern District of California

be practicing law." *Ibid.* (addressing other lawyer in case).  He does not accept a final

decision, but questions it because of "a wide variety of ridiculous errors" he does not specify,

Amd. Compl., *A-to-Z VIII*, Dkt. No. 5, because the judge was "blind or dumb" and "racist,"

Compl., *San Diego I*, or so on.

One excerpt not already printed illustrates nearly every step in this pattern.  It comes

from Rogers's complaint from his second federal-court suit against San Diego County and

Judge Lantz Lewis (*San Diego II*) alleging that Judge Lewis was racist in his handling of

Rogers's second state-court suit against the car shop (*Tipton II*); note that Judge Irma Gonzalez

dismissed Rogers's first such federal-court suit against Judge Lewis (*San Diego I*):

> This is the second time, Plaintiff brings this Court action through
> the U.S. Federal District Court — District of Southern California.
> Plaintiff, originally filed this action in July of 2012 against the
> County of San Diego.  Judge Irma E. Gonzalez failed to clearly
> and competently understand the case even after some of the
> evidence was given to her in the amended complaint.  In addition,
> she (Judge Gonzalez) used poor reasoning and illogical reasoning
> to determine her baseless and groundless conclusions.  This is
> <u>NOT</u> a complicated case to understand.  A person with a fourth
> grade education with a "half-of-a brain" could under this case. But
> Irma E. Gonzalez, is ill-prepared to resolve this matter in a
> competent manner.
>
> The original case was amended on or about January 22, 2013.  The
> above DEFENDANTS were <u>never</u> served with legal papers due to
> Hon. Irma E. Gonzalez's lack of spirit.  Substantial time elapsed
> from January 30, 2013 until April 16, 2013.  During this time, the
> case was under SUBMISSION as she had to "think about it."  On
> April 16, 2013, she reached an ignorant conclusion by
> DISMISSING THE CASE for no real apparent reason other than to
> shed herself from another case on the docket from a *pro se*
> plaintiff.  With only a modicum of interest from Hon. Irma E.
> Gonzalez, it's clear why this case is being filed for a second time.
>
> Plaintiff is not sure if this level of unfairness and partial conduct is
> a product of one judge or the entire Court at this time. Plaintiff
> demands the same level of fairness and equal treatment as any
> other person from the Court.
>
> The Defendant's foolish attorney, [name omitted], will attempt to
> have this case dismissed once again.  But this case will be <u>re-filed
> again and again and again as a warning</u> to the County of San Diego
> which will waste more of his time and the Court's time. **Plaintiff
> also refuses to respond to any more opposition on the part of
> San Diego County.**
>
> Due to the serious nature of the case, Plaintiff will

*United States District Court*
*Northern District of California*

1          CONTINUOUSLY file this case until there's a satisfactory
2     resolution.  !

3     Compl. at 2, *San Diego II*, Dkt. No. 1 (bold emphasis added).

4          Car shops, prospective employers, opposing counsel, and even Article III judges make

5     mistakes.  But, supposing that some of the folks Rogers has encountered in life and litigation

6     have made mistakes, the right resolution is to solve the problem reasonably out of court or to

7     bring straightforward complaints or appeals.  Instead, Rogers harasses seemingly without end.

8                    *C.*     **COUNTERARGUMENTS?**

9          Recall that Rogers failed to oppose a declaration of vexatiousness, except to attack the

10    undersigned and then assert that any such order would be retaliation (Dkt. No. 95).  As a result,

11    Judge Illston's order declining to declare Rogers vexatious in 2019 is the most on-point

12    resource suggesting any counterarguments.  Judge Illston pointed to two slivers on which

13    Rogers might barely hang his hat as a non-vexatious litigant.  They no longer offer respite.

14         *First*, Judge Illston noted that at least two courts have let Rogers proceed *in forma*

15    *pauperis*.  *Bank of S.F.*, 2019 WL 6311393, at *7.  This gave limited support to the argument

16    that Rogers's complaints were not all frivolous or malicious on their face, because if a court

17    assesses an indigent plaintiff's complaint and if the court then determines the complaint to be

18    meritless it must dismiss the complaint.  *See ibid.* (citing 28 U.S.C. § 1915(e)(2)).  But recall

19    Judge Illston said this was a "close case."  Rogers's ultimate losses on the merits in Judge

20    Illston's case and in the instant case now make clear that orders granting *in forma pauperis*

21    status cannot be taken as orders endorsing the merits of Rogers's complaints.  This is in part

22    because a grant of *in forma pauperis* status does not always involve an immediate review of

23    the complaint's merits — as explained further below as to tailoring (Analysis § 4).

24         *Second*, Judge Illston noted that a state-court case was dismissed with leave to amend

25    (*Robert Half I*), and that early federal-court discrimination cases had ended in stipulated

26    dismissals (*Bank of America* and *Previo*).  This provided limited support for the view that

27    Rogers's complaints were not complete fiction.  But this was a "close case" (*see supra*

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Statement § 3.B (providing context)). And, on balance, with the benefit of the dismissals since Judge Illston's order, this order now reaches a different result.

Moreover, this order finds that the malignant factors Judge Illston cited as favoring a prefiling order in the future — if Rogers continued filing iterations of the same complaint, attacking judicial officers, and threatening not to accept defeat but to be a perpetual pain to others until paid out — have metastasized since Judge Illston's order.

*          *          *

This is no longer a close case. This order finds Rogers's gambit has gone on for so long because his claims invoke serious principles (and because he delays their prosecution and defense), not because they possess any strength. His cases have alleged he has been treated differently — as he went to court, went to the bank, parked his car, parked his car three days later, applied for a job, applied for a different job, applied for a ninth job — because of his race, age, sex, or otherwise. Good-faith courts and counselors have given Rogers the benefit of the doubt. They have followed the procedures to develop a factual record and reach the merits.

But across 25 years of litigation, Rogers's real complaint has become clear. Rogers subjects people and companies associated with his ordinary setbacks to new, extraordinary setbacks he can control for a time: baseless litigation and public accusation. Rogers by now should know that bad-faith suits will not improve his situation on the merits nor — for at least the last 20 years, it seems, since *Previo* — at settlement. But Rogers has begun using court filings to escalate his extortionate threats out of court. And, whether defendants choose to pay or to defend meritless claims, his filings have inflicted costs on litigants and public courts.

No more. This order finds Rogers's complaints both frivolous and harassing. *See De Long*, 912 F.2d at 1148; *Molski*, 500 F.3d at 1059–61. This district will no longer participate in meting out Rogers's personal aggrievements at public expense.

### 4.    TAILORING.

"The fourth and final factor in the *De Long* standard is that the pre-filing order must be narrowly tailored to the vexatious litigant's wrongful behavior." *Molski*, 500 F.3d at 1061. This order reviews why the *in forma pauperis* application is not itself sufficient, then what is.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    DOES IN FORMA PAUPERIS SCREENING SUFFICE?

Judge Illston found that the "extreme" remedy of a prefiling requirement was not yet warranted in part because a sword already hung over Rogers's head for each case he brought *in forma pauperis*:  The fee-waiver benefits Rogers enjoyed could be cut and the case dismissed as soon as a court found his complaint frivolous.  *Id.* at *6–7.  But Rogers did not get the memo.  Since that order, the then-pending cases have been dismissed with prejudice, revealing the extent to which those complaints were frivolous from the start despite having received *in forma pauperis* status.  And, Rogers has continued to bring frivolous and harassing claims.  Moreover, as these cases help show, a review of the complaint is not always immediately performed upon an *in forma pauperis* application and not required — each addressed in turn:

#### (i)    Is an Immediate Review of a Complaint's Merits Conducted *at Filing as Part of the IFP Process?*

Rogers's frivolous complaints do not appear to have always received an immediate IFP-related merits review.

Yes, Rogers's claims expressly failed IFP-related merits screening in four cases:  *Zions Bancorp.*, Dkt. No. 4 at 1 (D. Nev.) (Judge George Foley, Jr.); *AMC III*, Dkt. No. 2 (D. Nev.) (Judge Cam Ferenbach), *accepted by* Dkt. No. 4 (Judge Andrew Gordon); *A-to-Z VIII*, Dkt. No. 3 [SI 71] (S.D. Cal.) (Judge William Hayes); *cf. San Diego II*, Dkt. No. 4 (S.D. Cal.) (Judge Marilyn Huff).  And, Rogers's claims passed an express complaint screening in two cases — without reasoned decisions.  *San Diego I*, Dkt. No. 3 (S.D. Cal.) (Judge Irma Gonzalez); *Caballero*, Dkt. No. 3 (S.D. Cal.) (Judge Dana Sabraw).  Each ended in dismissal with prejudice (*supra* Statement § 1).

But Rogers's claims were not expressly screened in eight cases:  In two, Rogers did not seek IFP status.  *See Bank of Am.*, No. C 99-05146 MJJ (N.D. Cal.) (no filing); *Previo*, No. 01-CV-2200-J (NLS) (S.D. Cal.) (same).  In one, Rogers was denied IFP status for having excessive income before the merits were considered.  *AMC I*, Dkt. No. 3 [SI 13] (S.D. Cal.) (Judge Michael Anello).  And, in five, it appears Rogers was granted IFP status without the case merits being expressly considered.  *See Robert Half II*, Dkt. No. 4 at 1 (N.D. Cal.) (Judge

1   Laurel Beeler) (application "compl[ied]" with statute); *Bank of S.F.*, Dkt. No. 4 (N.D. Cal.)

2   (Judge Susan Illston) (same); *LIIF*, Dkt. No. 6 (N.D. Cal.) (Judge Donna Ryu); *John Boys*,

3   Dkt. No. 5 (C.D. Cal.) (Judge Autumn Spaeth); *cf. City of S.F.*, Dkt. No. 4 (N.D. Cal.) (Judge

4   Joseph Spero) (stating affidavit plus complaint complied with statute, without more clarity).

***(ii)     Is an Immediate Review of a Complaint's Merits
Required at Filing as Part of the IFP Process?***

7   Indeed, it appears that nothing mandates that the merits be immediately considered upon

8   receiving an IFP application.  Our court of appeals has not decided the question.  It has held

9   only that whenever complaint screening is performed and reveals deficiencies, dismissal

10   becomes mandatory.  *Lopez v. Smith,* 203 F.3d 1122, 1126–30 (9th Cir. 2000) (en banc)

11   (interpreting Section 1915(e)).  District courts, without express analysis, appear split (*supra*).

12   The statutory text, structure, and related caselaw convince this order that screening is not

13   required immediately upon the application's receipt (though of course it may be performed at

14   any time, if performed it must result in immediate dismissal if the complaint is meritless or

15   malicious).

16   *First*, the statute's plain text says just that.  Section 1915(a)(1) permits the court to

17   approve *in forma pauperis* status so long as the applicant has submitted "an affidavit that

18   includes a statement of all assets" and "the nature of the action, defense or appeal and *affiant's*

19   *belief* that the person is entitled to redress."  Then, Section 1915(e)(2) instructs that if the court

20   "at any time" determines the claims are frivolous or malicious, the court shall dismiss the

21   action "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid."  *Id.*

22   § 1915(e)(2).  In other words, the application does not itself necessitate immediate screening of

23   the complaint; whenever such screening is undertaken, whether at filing or at the dispositive

24   motions deadline, a discovery of deficiencies then necessitates dismissal.

25   *Second*, this distinction between granting the status and dismissing the action, and this

26   distinction between a permissive screening and a mandatory dismissal, are supported by what

27   statutory structure our court of appeals has interpreted already.  Section 1915 "recognizes the

28   distinction between denials and grants of *in forma pauperis* applications[,] and dismissals of

57

1    the action." *O'Neal v. Price*, 531 F.3d 1146, 1157 n.3 (9th Cir. 2008) (Thomas, C.J.,

2    concurring in part).  And, comparing Section 1915 with Section 1915A reveals that screening

3    is not mandatory under Section 1915 — with this method of comparing the provisions being

4    the method used by several decisions interpreting these provisions.  *E.g.*, *Harris v. Harris*, 935

5    F.3d 670, 675–76 (9th Cir. 2019) (giving effect to differences); *Chavez v. Robinson*, 817 F.3d

6    1162, 1169 (9th Cir.), *as amended on reh'g* (Apr. 15, 2016) (giving effect to similarities).

7        To expand on that comparison of the two sections:  Section 1915(e)(2) pertains to

8    complaints brought by indigent persons, and governs here.  It states, in part (emphases added):

9        (e)(2) Notwithstanding any filing fee, or any portion thereof, that may have been
10       paid, **the court shall dismiss** the case **at any time if** the court determines that—
             (A) the allegation of poverty is untrue; or
             (B) the action or appeal—
11                 (i) is frivolous or malicious;
12                 (ii) fails to state a claim on which relief may be
                   granted; or
13                 (iii) seeks monetary relief against a defendant who is immune from
                   such relief.

14   Next, Section 1915A(a)–(b) pertains to complaints brought by incarcerated persons.  It states:

15       (a) Screening. —
16       **The court shall review, before docketing**, if feasible or, in any
         event, as soon as practicable after docketing, a complaint in a civil
17       action in which a prisoner seeks redress from a governmental
         entity or officer or employee of a governmental entity.
18
19       (b) Grounds for Dismissal. —
         On review, **the court shall identify cognizable claims or dismiss**
20       the complaint, or any portion of the complaint, if the complaint —
                 (1) is frivolous, malicious, or fails to state a claim upon
21                 which relief may be granted; or
                 (2) seeks monetary relief from a defendant who is immune
22                 from such relief.

23   Notably, Congress revised these  provisions together.  Where they use the same words, our

24   court of appeals has given them the same meaning.  *E.g.*, *Chavez*, 817 F.3d at 1168–69.  Where

25   they use different words, our court of appeals has given effect to those distinctions.  *E.g.*,

26   *Harris*, 935 F.3d at 675–76.

27       Comparing the two provisions reveals a straightforward difference:  Section 1915 does

28   not say *when* any screening must take place.  Section 1915A, by contrast, says screening must

United States District Court
Northern District of California

take place "before docketing, if feasible." "Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Ibid.* (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982)). This order thus reads Section 1915 as not requiring the court to screen a complaint immediately upon receipt of the *in forma pauperis* application.

That reading comports with the plain text and structure, and with the purposes our court of appeals has attributed to Section 1915 and Section 1915A: The parallel provisions support access to the courts by indigent and incarcerated persons while filtering out frivolous filings, and the most stringent filters are applied to actions brought by incarcerated persons. *See Lopez*, 203 F.3d at 1129 n.10; *Taylor v. Delatoore*, 281 F.3d 844, 849–50 (9th Cir. 2002). Any reading that would infer as present in Section 1915(e)(2) the mandatory "before docketing" screening expressed only in Section 1915A "would [impose] harsh consequences on a group of plaintiffs — indigent non-prisoners — not even intended to be affected" by the latter, prisoner-specific provision. *Cf. Lopez,* 203 F.3d at 1129 n.10. Perhaps Congress found that criminal convictions — not indigency — were positively correlated with a tendency to file harassing complaints. Whatever the cause of the differences, the result text and statutory structure support the reading above.

The typical *in forma pauperis* litigant need not have his complaint scrutinized immediately at the courthouse doors. But Rogers has abused his right to come to court.

### *B.* A NARROWLY TAILORED PRE-SCREENING ORDER.

A prefiling order is overbroad when it subjects *all* future claims to prefiling review without *any* particular findings. *De Long*, 912 F.2d at 1148; *see also Moy*, 906 F.2d at 470–71 ("no evidence on this record that Moy has a general history of litigious filing"). By contrast, an order is narrow when it subjects all future claims related to an event, set of defendants, or even category of claims about which the court has found past frivolous and harassing filings. *Wood v. Santa Barbara Chamber of Comm., Inc.*, 705 F.2d 1515, 1525–26 (9th Cir. 1983) (set of defendants); *Molski*, 500 F.3d at 1061 (class of claims).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    This order has found that Rogers's past complaints alleging discrimination on the basis of

2    race, sex, national origin, and economic status were frivolous and harassing. Like the district

3    court in *Molski*, the undersigned concludes that this litigant is engaged in "a kind of legal

4    shakedown scheme" that destroys the "purpose and spirit" of the very laws he most frequently

5    invokes. 347 F. Supp. 2d at 867. Rogers's claims of discrimination must be subjected to

6    prefiling review.

7    This order furthermore has found that Rogers not only seeks to shakedown a common

8    type of defendant using a common type of claim but moreover to settle scores with people who

9    cross him in other parts of life. Rogers has brought frivolous and harassing complaints not

10    only about job applications (*Bank of Am.*, *Previo*, *Robert Half I–II*, *Bank of S.F.*, *City of*

11    *Dublin*, *Low Income Investment Fund*), but about his car (*Tipton I–III*, *A-to-Z I–VIII*, *John*

12    *Boys*, *Caballero*), his apartment (*AMC I–IV*), his bank (*Zions Bancorp.*), and even his other

13    court proceedings (*e.g.*, *San Diego I–II*). And, to exact a toll on those who cross him, Rogers

14    has brought not merely one set of claims but — bragging about his ability to evade resolution

15    until he gets full satisfaction — multiple sets of equally meritless claims (*compare, e.g.*, *City of*

16    *Dublin* (evolving his claims from hiring discrimination to reach "job-posting fraud"), *with A-*

17    *to-Z I–VIII* (evolving his claims to reach discrimination)). Finally, alarming the undersigned,

18    Rogers appears recently to have become more desperate and daring, sending threats that

19    approach or cross into criminal extortion and that leverage his bad-faith district court filings

20    (*see* Dkt. No. 90 at 20–25). Thus, Rogers's claims asserting other subject matter and Rogers's

21    complaints iteratively picking at or newly springing upon perceived wrongs in the receding

22    past (*e.g.*, *A-to-Z VIII* (out of time); *John Boys* (same)) must be subjected to prefiling review.

23    This order thus finds that the following prefiling order is necessary to curtail the

24    misconduct identified; it is tailored as narrowly as possible while still being effective against

25    Rogers's shifting, iterative complaints that evade easy categorization. So:

26

27

28

This order **DECLARES** Brian F. Rogers a vexatious litigant and imposes the following prefiling order.

**IT IS HEREBY ORDERED** that Rogers may not file, nor may the Clerk of Court accept for filing from Rogers, any future complaint in the United States District Court for the Northern District of California that:

1. Alleges discrimination on any basis under any state or federal law(s);

2. Alleges liability related to Rogers's application(s) to work;

3. Alleges liability related to the repair, registration, parking, or towing of Rogers's car(s);

4. Alleges liability stemming from other litigation; ***and/or***,

5. Addresses any events predating the proposed complaint by more than three years;

until the proposed complaint is subjected to and passes a prefiling review by a judge of this court.

To allow Rogers the opportunity to seek relief from our court of appeals, the imposition of this prefiling requirement is **STAYED UNTIL JUNE 6, 2025, AT NOON.** The prefiling order takes effect immediately thereafter absent further order from this Court or its reviewing courts.

## CONCLUSION

After notice and opportunity to be heard and an extensive record review, this order has found that Brian F. Rogers is a vexatious litigant, and that the above prefiling order is necessary and narrowly tailored to curtail his vexatious conduct.

**IT IS SO ORDERED.**

Dated: March 10, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

61